Insurance Department
No. 2004-518

## APPEAL OF ALPHADIRECTIONS, INC.
### (New Hampshire Department of Insurance)

Argued: May 10, 2005
Opinion Issued: July 29, 2005

478

*Bernstein, Shur, Sawyer and Nelson, P.A.*, of Manchester (*Andru H. Volinsky* on the brief and orally), for the petitioner.

*Kelly A. Ayotte*, attorney general (*Anthony I. Blenkinsop*, attorney, and *Suzanne M. Gorman*, senior assistant attorney general, on the brief, and *Mr. Blenkinsop* orally), for the New Hampshire Department of Insurance.

DUGGAN, J. The petitioner, AlphaDirections, Inc., appeals a decision of the New Hampshire Department of Insurance finding that it provided insurance brokerage and insurance consulting services without the required insurance producer license and imposing a fine of $42,500. *See* RSA 400-A:15, III (1998); RSA 402-J:3 (Supp. 2004); RSA 405:44-a (Supp. 2004); RSA 405:44-g (1998). We affirm.

The record supports the following facts. Prior to the change in administration following the November 2002 gubernatorial election, the State had a fully insured program of medical and dental insurance through a health insurance contract with Anthem Blue Cross Blue Shield of New Hampshire (Anthem) and a dental insurance contract with Northeast

Delta Dental (Delta Dental). At that time, Kenmore Associates was the duly-appointed broker of record for the State with respect to these programs and received commissions from Anthem and Delta Dental in that capacity.

Soon after the election, the new administration began to pursue cost-saving measures with regard to the State's health and dental insurance plans, including the question of whether to switch to a self-insured program. Kenmore Associates did not recommend a self-insured program because of the upfront budgetary increase for the required funding reserves. Instead, Kenmore Associates recommended that the State use a retention accounting program for the health insurance, as it currently did for the dental insurance, which could result in cost savings. The new administration, however, believed that a program of self-insurance would result in more cost savings to the State.

Joseph D'Alessandro, a member of the Governor's transition team, was the designated point-person with respect to shifting the health benefits to a self-insured basis. Linda Pepin, who had previously worked with D'Alessandro in private industry, also worked on the transition team. In addition, Pepin was appointed to the State negotiating committee for collective bargaining with the State Employees Association (SEA). Pepin's services during this period of time were on a volunteer basis. At the same time, D'Alessandro and Pepin were partners in AlphaDirections, Inc., a consulting business started by Pepin. Neither AlphaDirections nor Pepin was licensed as an insurance producer to provide insurance brokerage and consulting services under RSA 402-J:3.

In late 2002 and early 2003, D'Alessandro and Pepin began to gather information, sometimes through Kenmore Associates, regarding the State's existing health and dental insurance programs. They also collected information concerning the structure of a new program and the transition to a new program. On March 7, 2003, D'Alessandro became the new director of personnel for the State. Three days later, Pepin, on behalf of AlphaDirections, submitted, through D'Alessandro, a cost estimate of $150,000 for consulting services to the State. The cost estimate described the services for the "2003/04 Health Insurance Renewal" to include consulting work on, among other things, active and retired employees, medical and dental plans, life and disability programs and fully-insured and self-insured proposals. The cost estimate also described the services for the "2003/04 Open Enrollment Activity" to include work on communications and implementation.

On March 20, 2003, D'Alessandro met with a representative of Delta Dental, who advised him that Pepin could receive consultant fees from the State or commissions from Delta Dental only if she was licensed as an

insurance producer. Anthem also advised D'Alessandro that Pepin must be licensed as an insurance producer in order to receive commissions. Subsequently, Kenmore Associates was terminated as broker of record and, on March 24, 2003, was replaced by Denis French, a licensed producer, and his company NiBri Benefit Services, Inc. (NiBri). Days prior to French's appointment as broker of record, Pepin supplied French with the tax identification information for AlphaDirections. In the months following his appointment, French performed no more than six hours of work on the State contracts, had very little contact with D'Alessandro and never had contact with Anthem, Delta Dental or Cigna, which was eventually selected to administer the State's self-insurance plan. From the date of his appointment, French intended to forward all the commissions he received to AlphaDirections.

Anthem and Delta Dental were informed of the change in the broker of record and that commission payments previously made to Kenmore Associates were thereafter to be made to NiBri. From April to November 2003, Anthem issued nine checks to NiBri totaling $131,538.55, which, in turn, issued nine checks to AlphaDirections totaling $131,538.55. At the same time, Delta Dental issued nine checks to NiBri totaling $63,197.90, which, in turn, issued eight checks to AlphaDirections totaling $55,474.07. NiBri retained the last commission check from Delta Dental because it was received after the department of insurance had initiated its investigation.

During this same time frame, Pepin, through AlphaDirections, participated in the arrangement of a short-term renewal of the fully insured plan, designed and proposed possible benefit changes to achieve cost savings, managed the State's conversion to a self-insured plan and performed other functions with respect to the State's insurance program. Pepin frequently obtained information from Delta Dental, Anthem and Cigna including monthly experience reports, claims data, options for changes in the benefit structure and quotes for various changes in the plan designs. With this information, Pepin analyzed the utilization of the insurance plans, the current benefit structure, the cost effectiveness of proposed changes to the benefits and the cost comparison between a fully insured and a self-insured program. She, in turn, gave advice and recommendations based upon her analysis to D'Alessandro; Donald Hill, the commissioner of administrative services; and the State committee negotiating a collective bargaining agreement with the SEA.

On April 28, 2003, Pepin made a presentation to Commissioner Hill and D'Alessandro regarding the work she was doing and the cost savings associated with the recommended benefits changes. With regard to the medical insurance for both active and retired employees, Pepin

recommended converting to a self-insured program and implementing certain plan design changes including premium sharing, higher co-pays and increased deductibles. Pepin also recommended a self-insured program for prescription drugs and suggested increasing the employees' cost from a two-tier plan to a three-tier plan. With regard to dental insurance, Pepin recommended remaining with Delta Dental with a retention accounting program. In addition, Pepin intended to negotiate a renewal rate that would be cost neutral compared to the previous year and to change the plan design to include higher annual deductibles. The presentation also covered the use of the Choicelinx program to administer the enrollment and management of the insurance programs, recommendations on stop loss coverage, the necessary requests for proposals, the projected savings based upon her recommendations and a timeline for implementing the new insurance programs.

Following the timeline, Pepin negotiated the proposed changes in plan design with Anthem, Cigna and the SEA. In addition, Pepin requested information from the various insurance carriers in order to put together a proposal for a bid and sent proposed plan designs to the carriers for quotes. Ultimately, Cigna was awarded the contract to administer the State's self-insurance plan.

On March 4, 2004, the insurance commissioner issued an order directing the petitioner to appear at a hearing and show cause as to why the commissioner should not find that the petitioner, acting through its owner and president, Pepin, violated various insurance statutes by providing insurance consulting services and negotiating insurance coverage for a fee without a producer license. *See* RSA 402-J:3; RSA 405:44-a. The petitioner was also ordered to show cause why the commissioner should not assess an administrative fine of $42,500.

Following a four-day hearing, the hearing officer issued an order finding that the commissioner proved by a preponderance of the evidence that the petitioner violated the insurance brokering and consulting statutes. *See* RSA 402-J:3; RSA 405:44-a. The hearing officer also found that the commissioner's imposition of a $42,500 fine did not constitute an abuse of discretion. *See* RSA 400-A:15, III; RSA 405:44-g. This appeal followed. *See* RSA 400-A:24 (1998).

On appeal, the petitioner argues that the hearing officer erred in finding that it violated the insurance brokering and consulting statutes and that the fine of $42,500 was not arbitrary. Our review of the insurance commissioner's order is limited. An order of the commissioner is presumed to be *prima facie* lawful and reasonable and will be overturned only when a petitioner shows by a clear preponderance of the evidence that it is

unreasonable or unlawful. *State Farm Mut. Auto. Ins. v. Whaland,* 121 N.H. 400, 403 (1981). We address each argument in turn.

*I. Insurance brokering violations*

The petitioner argues that the hearing officer erred in finding that it violated the insurance brokering statute. *See* RSA 402-J:3. Specifically, it argues that: (1) it could not "obtain" insurance for the State because only the Governor and Executive Council can approve contracts; (2) the hearing officer misinterpreted the statutory meaning of "negotiate"; (3) the statute does not apply to a person obtaining a bid or price quote; and (4) interpreting the statute to apply in this case violates the petitioner's federal and State due process rights and the Separation of Powers Clause of the State Constitution. *See* RSA 402-J:3; RSA 402-J:2, XI (Supp. 2004).

RSA 402-J:3 prohibits selling, soliciting or negotiating insurance without an insurance producer's license. RSA 402-J:2, XI defines "negotiate" as

> the act of conferring directly with or offering advice directly to a purchaser or prospective purchaser of a particular contract of insurance concerning any of the substantive benefits, terms, or conditions of such contract, provided that the person engaged in that act either sells insurance, or obtains insurance from insurers for purchasers.

We first address whether the term "obtain" requires the person subject to licensure under the statute to have the actual authority to purchase insurance. In matters of statutory interpretation, we are the final arbiter of the intent of the legislature as expressed in the words of the statute considered as a whole. *In the Matter of Jacobson & Tierney,* 150 N.H. 513, 515 (2004). We look to the plain and ordinary meaning of the statutory language in determining legislative intent. *In re Juvenile 2003-248,* 150 N.H. 751, 751-52 (2004). We do not read words or phrases in isolation, but rather in the context of the entire statute. *Id.*

█ Considering the statute as a whole, we hold that the term "obtain" does not require the person subject to licensure under the statute to have the actual authority to purchase insurance. The statute requires that an individual be licensed to negotiate insurance, which is defined in part as "offering advice directly *to a purchaser* or *prospective purchaser.*" RSA 402-J:2, XI (emphasis added); *see* RSA 402-J:3. Thus, the definition itself acknowledges that it is sufficient for the person subject to licensure to offer advice to the ultimate purchaser, and the person need not have the actual authority to purchase insurance. As the hearing officer aptly noted:

It is generally the case that the prospective purchaser of insurance retains the ultimate decision-making authority with respect to the purchase, but the broker is no less "obtaining" the insurance for purchase by the prospective insured. Adoption of the restrictive interpretation advanced by AlphaDirections would render the licensing required for brokers in order to receive commissions meaningless in the vast majority of transactions. This ... represents an effort [by AlphaDirections] to snatch ambiguity from the jaws of clarity.

In its brief, the petitioner next argues that the hearing officer "misinterpreted the statutory meaning of 'negotiate' by adding his own interpretation of the term that should have been plain." The petitioner, however, does not elaborate further on the alleged error, nor offer an alternative definition or application of the term to this case.

█ The hearing officer found that many of the petitioner's activities fell "within the common meaning of the words 'advice' and 'confer' in the definition of negotiate." The hearing officer specifically referred to, among other activities, the petitioner's: (1) management of the State's conversion to a self-insured plan; (2) participation in the arrangement for a short-term renewal of the fully insured plan; and (3) involvement in designing and proposing benefit changes to achieve cost savings. These acts fit squarely within the statutory definition of negotiate. *See* RSA 402-J:2, XI. These findings are adequately supported by the record and the petitioner has failed to show by a clear preponderance of the evidence that the findings are unreasonable or unlawful. *See State Farm Mut. Auto. Ins.*, 121 N.H. at 403.

█ The petitioner next argues that the statute requires the producer to obtain insurance, and thus does not apply to a person obtaining a bid or price quote for insurance. *See* RSA 402-J:2, IV, XI (Supp. 2004). As we explained above, it is generally the case that the prospective purchaser of insurance retains the ultimate decision-making authority with respect to the purchase. It necessarily follows that during negotiations, the producer could only obtain bids or price quotes for the prospective purchaser. The producer, however, is nonetheless "obtaining insurance" for purchase by the prospective insured. Again, to hold otherwise would render meaningless the licensing required for producers in order to receive commissions in the vast majority of transactions.

Finally, the petitioner argues that this interpretation of the insurance brokering statute violates its rights to federal and State due process and violates the Separation of Powers Clause of the State Constitution. We

conclude that these arguments were not adequately briefed and, therefore, decline to address them. *See In re Juvenile 2003-604-A*, 151 N.H. 719, 721 (2005).

## II. Insurance consulting violations

The petitioner argues that the hearing officer erred in finding that it violated the insurance consulting statute. *See* RSA 405:44-a. Specifically, it argues that: (1) its work from August 2003 to November 2003 did not involve insurance consulting and thus the payments received during that time were not in violation of the statute; (2) it never reviewed an insurance policy but "simply discuss[ed] insurance concepts;" and (3) its management of the State's conversion to self-insurance does not fall within the statute's licensing requirements because "[a]n employer's decision to self insure is not 'insurance.'"

RSA 405:44-a, I, provides that:

> No person, corporation, partnership or association shall, for a fee received or to be received, offer to examine, or examine or aid in examining, any policy of insurance ... for the purpose of giving, or give or offer to give, any advice, counsel, recommendation or information in respect to the terms, conditions, benefits, coverage or premium of any such policy or contract, or in respect to the expediency or advisability of altering, changing, renewing or rejecting any such policy or contract ... from any company ... unless he or she holds a license as an insurance producer under the provisions of RSA 402-J.

The petitioner first argues that, because its work from August 2003 to November 2003 involved communications and implementation and not insurance consulting, the payments received during that time were not in violation of the statute. The statute does not require simultaneous payment for consulting services rendered. *See id.* Rather, the statute requires a license for consulting services that are performed "for a fee received or *to be received.*" *Id.* It is logical to conclude, as the hearing officer did, that the brokerage fees received by the petitioner related to previously-provided unlicensed consulting services. To hold otherwise would result in the inability to prevent unlicensed insurance consulting if there were any delay between the unlawful consulting action and the receipt of payment.

The petitioner next argues that it never reviewed an insurance policy but "simply discuss[ed] insurance concepts." Thus, the petitioner contends

that because it did not review a specific policy or policy language, its conduct did not violate the insurance consulting statute.

RSA 405:44-a prohibits the performance of a number of activities for a fee without a producer's license. One such activity is offering to examine, examining or aiding in examining any policy of insurance. RSA 405:44-a, I. Another activity is giving or offering to give "any advice, counsel, recommendation or information in respect to the terms, conditions, benefits, coverage or premium of any such policy or contract." *Id.* A further activity is giving or offering to give advice, counsel, recommendation or information "in respect to the expediency or advisability of altering, changing, exchanging, converting, replacing, surrendering, continuing, renewing or rejecting any such policy or contract, or of accepting or procuring any such policy or contract from any company." *Id.*

■ While the first regulated activity under RSA 405:44-a involves examining a specific policy or policy language, the other activities regulated by the statute do not necessarily involve a specific policy. The hearing officer found that many of the petitioner's activities fell within the clauses dealing with giving or offering to give "advice, counsel, recommendation or information," and thus constituted insurance consulting in violation of the statute. *See id.* In making this finding, the hearing officer relied upon, among other things, the petitioner's management of the State's conversion to a self-insured plan, participation in the arrangement for a short-term renewal of the fully insured plan, and work in designing and proposing benefit changes to achieve cost savings.

There is ample evidence in the record to support this finding. As detailed above, the petitioner obtained information from Delta Dental, Anthem and Cigna including monthly experience reports, claims data, options for changes in the benefit structure and quotes for various changes in the plan designs. The petitioner analyzed this information and gave advice and recommendations based upon her analysis to D'Alessandro, Commissioner Hill, and the State negotiating committee for collective bargaining with the SEA. The petitioner's advice included, among other things, recommendations on plan changes and the cost comparison between a fully insured and self-insured program. In addition, the petitioner negotiated the proposed changes in plan design with Anthem and Cigna and prepared proposed plan designs that were sent to the insurance carriers for bids.

■ Finally, the petitioner argues that its management of the State's conversion to self-insurance does not fall within the statute's licensing requirements because "[a]n employer's decision to self insure is not

'insurance.'" As stated above, RSA 405:44-a regulates giving or offering to give advice on the expediency or advisability of, among other things, altering, converting, replacing or rejecting insurance. The petitioner provided cost comparisons of a self-insured and fully insured program, made recommendations based upon its analysis of the data and managed the State's conversion to self-insurance. The petitioner's activities fall squarely within the statute. *See id.* Accordingly, the petitioner has failed to show by a clear preponderance of the evidence that the hearing officer's findings are unreasonable or unlawful. *See State Farm Mut. Auto. Ins.,* 121 N.H. at 403.

*III. Administrative fine*

The petitioner argues that the hearing officer erred in finding that the fine of $42,500 was not arbitrary. *See* RSA 400-A:15, III; RSA 405:44-g. We may set aside an administratively imposed punishment if it is so harsh or excessive as to be unreasonable or to constitute an unsustainable exercise of discretion. *Appeal of Metropolitan Prop. & Liabil. Ins. Co.,* 120 N.H. 733, 736 (1980). But because appropriate sanctions must necessarily be tailored to particular cases, we are disinclined to substitute our judgment for that of the commissioner in all but exceptional cases. *Id.* at 736-37.

In determining the fine of $42,500, the insurance commissioner noted that "AlphaDirections received [seventeen] payments from NiBri for providing insurance consulting work" to the State. Relying upon RSA 405:44-e, the commissioner reasoned that "[e]ach time AlphaDirections received a payment for providing insurance consulting work, it violated New Hampshire law regarding insurance consultants." The commissioner also noted that the petitioner's conduct violated various other provisions of the insurance licensing statutes. The commissioner thus concluded that, given the serious and substantial violations and because each violation is subject to an administrative fine not to exceed $2,500, a fine of $42,500 was warranted.

RSA 400-A:15, III provides that "[a]ny person who knowingly violates any rule, regulation, or order of the commissioner may ... be subject to such ... administrative fine not to exceed $2,500." RSA 405:44-g provides that "[a]ny person, corporation, partnership, or association who acts as an insurance consultant without such license or during a suspension of his or its license shall be subject to an administrative fine not to exceed $2,500 for each such act."

■ Both statutes provide for "an administrative fine not to exceed $2,500." The consulting statute references a fine for "each act," RSA

405:44-g, while the brokering statute does not, *see* RSA 400-A:15, III. We agree with the hearing officer's conclusion that "[t]here are many ways an appropriate penalty could have been calculated, and [we] may have chosen another. However, given the statutes' common element of receipt of a fee, it was not an abuse of discretion to look to the series of payments for guidance." *See Appeal of Metropolitan Prop. & Liabil. Ins. Co.*, 120 N.H. at 736-37.

*Affirmed.*

BRODERICK, C.J., and NADEAU and DALIANIS, JJ., concurred.