Rockingham
No. 2005-067

MORTGAGE SPECIALISTS, INC.

v.

JOSEPH C. DAVEY, IV & a.

Argued: March 9, 2006
Opinion Issued: July 26, 2006

*Devine, Millimet & Branch, P.A.*, of Manchester (*Alexander J. Walker, Jr.* and *Danielle L. Pacik* on the brief, and *Mr. Walker* orally), and *Shaheen & Gordon, P.A.*, of Concord (*Arpiar G. Saunders, Jr.* on the brief), for the plaintiff.

*Sheehan Phinney Bass + Green, P.A.*, of Manchester (*Christopher Cole* and *Robert R. Lucic* on the brief, and *Mr. Cole* orally), for the defendants.

DALIANIS, J. The plaintiff, Mortgage Specialists, Inc., appeals: (1) an order of the Superior Court (*Morrill*, J.) denying its motion to set aside the jury verdict on its claim for misappropriation of trade secrets, *see* RSA ch. 350-B (1995); and (2) a pretrial order of the Superior Court (*Coffey*, J.) dismissing its other claims. The defendants, Joseph C. Davey, IV, Team Mortgage, LLC, Steven Michael Carbone, and Signature Mortgage Group, LLC, cross-appeal a post-trial order of the Superior Court (*Morrill*, J.) assessing sanctions against them. We affirm in part, vacate in part, and remand.

## I. Background

Mortgage Specialists is a mortgage brokerage and lending company with offices in Massachusetts and New Hampshire. Defendants Davey and Carbone worked as loan originators for Mortgage Specialists. In July 2002, both left Mortgage Specialists to work for a competitor, Mortgage Partners. When they left, each took with him copies of customer information retained in the course of his work. The most important piece of information was the customer's current interest rate, from which a competitor could learn whether refinancing would benefit the customer.

Davey and Carbone subsequently started their own mortgage businesses. Davey, who worked at Carteret Mortgage for a short time

after leaving Mortgage Partners, is the owner of defendant Team Mortgage, LLC. Carbone is the owner of defendant Signature Mortgage Group, LLC. Since leaving Mortgage Specialists, Davey and Carbone have both closed loans, with their subsequent employers and with their own businesses, for customers with whom they had previously worked at Mortgage Specialists.

When Mortgage Specialists learned that Mortgage Partners had contacted its former customers, it initiated suit against Mortgage Partners for misappropriation of trade secrets. Davey and Carbone were both deposed in November 2002 in connection with that litigation, and both acknowledged that they had taken copies of customer information with them when they left Mortgage Specialists. Mortgage Specialists brought this suit in 2003, alleging a variety of claims and seeking injunctive relief and damages.

The trial court dismissed all of Mortgage Specialists' claims except for its claim that the defendants misappropriated its trade secrets. It also issued a preliminary injunction prohibiting the defendants from misappropriating or disclosing Mortgage Specialists' customer information and prohibiting them from contacting or communicating with any of Mortgage Specialists' current or former customers, with some limited exceptions.

A jury trial was held in September 2004 on the trade secrets claim. The jury returned a verdict in favor of the defendants. The trial court subsequently imposed sanctions upon the defendants for their conduct prior to and during trial.

## II. The Trade Secrets Claim

Mortgage Specialists filed a motion to set aside the jury's verdict. It asserted that the jury's verdict was "against the great weight of the evidence presented at trial" and "[n]o reasonable jury could have reached the verdict it did in this case in the face of such overwhelming evidence." The trial court denied Mortgage Specialists' motion, finding that a reasonable jury could have concluded that the alleged confidential information underlying its claims was not a trade secret because "Mortgage Specialists' customer information was not subject to reasonable efforts to maintain its secrecy under the circumstances." *See* RSA 350-B:1, IV(b). We agree.

A reasonable jury could have found the following facts: Davey and Carbone began working as loan originators for Mortgage Specialists in 1999. Both were hired as independent contractors. Upon hiring, they were neither asked to sign a non-disclosure or confidentiality agreement, nor told that Mortgage Specialists' documents or customer information was

confidential or constituted trade secrets. Despite a relatively high turnover among its loan originators and the tendency of loan originators to stay in the mortgage business after leaving Mortgage Specialists, throughout the time during which Davey and Carbone worked for Mortgage Specialists, the company had no written policy regarding confidentiality or document destruction and no employee handbook. Although Mortgage Specialists created a confidentiality and non-disclosure agreement by 1999, only some of its loan originators actually signed it between 1999 and 2001. Davey and Carbone deny having seen or heard about the agreement before July 2002, when Mortgage Specialists asked all of its loan originators to sign it. Neither Davey nor Carbone signed the agreement, and each terminated his relationship with Mortgage Specialists shortly thereafter. Prior to being presented with the agreement, neither Davey nor Carbone had been told that customer information belonged to Mortgage Specialists or that they were prohibited from copying or maintaining copies of customer information. Mortgage Specialists did not ask either Davey or Carbone to return or destroy customer information before leaving the company.

While Davey and Carbone were working at Mortgage Specialists, it collected and stored customer information and disseminated it to its employees and independent contractors in various formats. Lists of potential new customers and lists of potential repeat customers were distributed regularly to Mortgage Specialists' telemarketers. The lists of potential repeat customers were not marked as trade secrets or as confidential. Nevertheless, access to the lists of potential repeat customers, which contained information about each customer's loan amount, loan type, and interest rate, was restricted. Supervisors gave telemarketers only a limited number of pages from these lists during a given shift. The telemarketers were not permitted to photocopy the pages, and were required to return all pages of the list to the supervisor at the end of the shift. Davey and Carbone did not have access to these lists, and Mortgage Specialists has not alleged that they took copies of these lists when they left.

As telemarketers contacted individuals interested in doing business with Mortgage Specialists, including both new and repeat customers, the telemarketers created "lead sheets" to be passed on to loan originators such as Davey and Carbone. The lead sheets often included the name and phone number of the individual, and sometimes included the individual's current interest rate. The lead sheets were not marked as trade secrets or as confidential. Neither Davey nor Carbone was ever instructed to destroy the lead sheets or to return them to a particular individual or department.

As loan originators met with customers, the loan originators gathered all of the information needed to complete a standard residential loan

application. Known as a Form 1003, the application consisted of several pages and required the applicant to disclose a great deal of personal information, including a social security number, detailed information regarding income, bank accounts, and credit history, and the interest rate on the existing mortgage. When meeting with a customer, Davey and Carbone both typically took notes on the back of the lead sheet and filled out the application by hand. The loan application was accompanied by a privacy policy disclosure, indicating that the customer's information would not be disclosed to third parties.

After the loan application was completed, the application package was returned to Mortgage Specialists for processing. Davey and Carbone often retained copies of the lead sheet or the first page of the application. Carbone testified that some loan originators retained this information so that they could keep in touch with the customer throughout the loan application process.

After the completed application was given to the loan processors at Mortgage Specialists, all application information was entered into Mortgage Specialists' computerized database, which could be accessed by the processors. While loans were in process, lists of all open loan applications were regularly generated from this database and distributed to all of Mortgage Specialists' loan originators. These lists, referred to as "pipeline reports," contained basic information about each customer's loan, including the customer's last name, the type of loan, and the interest rate. The pipeline reports were not marked as trade secrets or as confidential. Loan originators were not instructed to destroy the pipeline reports or to return them to a particular individual or department.

After the loan was closed, the electronically-stored customer information was transferred into a password-protected database, accessible only by one of the owners and the office manager. If a loan originator needed access to an application after the loan was closed, he could obtain a computer printout of the application information from the individuals who had access to the database. The printout was not marked as a trade secret or as confidential, and loan originators were not instructed to return it or to refrain from copying it.

While Davey and Carbone were working at Mortgage Specialists, the hard copies of customers' closed loan files were stored in the attic of Mortgage Specialists' Plaistow office. Access to the attic was through an unlocked door and was not restricted. Davey and Carbone sometimes entered the attic and retrieved old files from storage when they wanted to review or copy information.

After leaving Mortgage Specialists, Davey and Carbone both worked as loan originators at Mortgage Partners. Carbone gave a telemarketer at

Mortgage Partners a bag filled with copies of loan applications that he had taken with him from Mortgage Specialists and she was instructed to contact all of his former customers to let them know that he was now working at Mortgage Partners. One of the former customers, when contacted by Mortgage Partners, was angered by the fact that Mortgage Partners had access to his personal information and complained about the situation to Mortgage Specialists in August 2002. The customer spoke to several employees at Mortgage Specialists, and ultimately met with its president. Despite Mortgage Specialists' apparent knowledge that Mortgage Partners had access to its customer information, it took no steps to retrieve the customer information from Mortgage Partners' possession.

On appeal, Mortgage Specialists contends that there was overwhelming evidence that the defendants misappropriated its trade secrets within the meaning of the New Hampshire Uniform Trade Secrets Act, RSA chapter 350-B. It argues that the trial court erred in denying its motion to set aside the jury verdict, claiming that no reasonable juror could have found that its efforts to maintain the secrecy of its customer information were not reasonable under the circumstances.

■ A jury's verdict may only be set aside if it is conclusively against the weight of the evidence or if it is the result of mistake, partiality, or corruption. *PMC Corp. v. Houston Wire & Cable Co.*, 147 N.H. 685, 692 (2002). "Conclusively against the weight of the evidence" means that the verdict was one no reasonable jury could return. *Id.* As the plaintiff argues only that the jury verdict was against the weight of the evidence, we limit our review to that issue. We will not overturn the trial court's denial of Mortgage Specialists' motion to set aside the jury verdict unless it is an unsustainable exercise of discretion. *See Babb v. Clark*, 150 N.H. 98, 100 (2003).

■ For information to be a trade secret, the information must, among other things, be "the subject of efforts that are reasonable under the circumstances to maintain its secrecy." RSA 350-B:1, IV(b). Mortgage Specialists argues that the measures it took to maintain the secrecy of its customer information were "reasonable under the circumstances because they clearly put the loan originators on notice that [the] type of information contained in the Form 1003s is confidential . . . and should not be disclosed." We disagree.

■ As the trial court indicated in its order, the jury heard testimony that the documents containing customer information, including customers' current interest rates, "were never marked confidential or trade secret," that those documents "were kept in an attic for many years," and that "the

loan originators were not consistently and uniformly given instructions as to the proper treatment of the information as confidential and/or proprietary." While there was evidence that Mortgage Specialists took specific steps to maintain the secrecy of its lists of potential repeat customers, lists to which the defendants did not have access and did not copy, there was conflicting testimony as to whether Mortgage Specialists took any steps at all to maintain the secrecy of customer information that was stored and disseminated to its employees and independent contractors in other forms. Although Mortgage Specialists provided all of its customers with a privacy policy acknowledgement indicating that it would not disclose the customer's nonpublic personal information to nonaffiliated third parties, and it placed shredders around its office, these efforts could have been found by the jury only to demonstrate a need to protect customers from the sale of their personal information or from the risk of identity theft, rather than an intent to prevent Mortgage Specialists' employees from misappropriating customer information. While access to the electronic copies of old loan applications was restricted by a password, there was testimony at trial indicating that any loan originator could request that a copy of that information be printed and given to him, and that any loan originator could enter the attic storage area to access a hard copy of the closed file. While Mortgage Specialists took some steps to maintain the secrecy of its customer information, the jury could have found that its efforts were inconsistent.

The trial court's decision not to set aside the jury verdict was not an unsustainable exercise of discretion, as a reasonable jury could conclude from the evidence presented at trial that Mortgage Specialists' customer information was not subject to reasonable efforts to maintain its secrecy under the circumstances, and, accordingly, was not a trade secret.

### III. Preemption of Other Claims

Mortgage Specialists asserted the following claims against the defendants: misappropriation of trade secrets, *see* RSA ch. 350-B; conversion; tortious interference with advantageous relations; violation of the New Hampshire Consumer Protection Act (CPA), *see* RSA ch. 358-A (1995 & Supp. 2005); and breach of fiduciary duty. However, the trial court granted, in part, the defendants' motion to dismiss, allowing Mortgage Specialists to proceed on the trade secrets claim alone. We affirm this decision of the trial court to the extent that it dismissed the claims for conversion and breach of fiduciary duty, but vacate it to the extent that it dismissed the claims for tortious interference with advantageous relations and violation of the CPA.

Mortgage Specialists alleged the following relevant facts in its writ: While Davey and Carbone were working for Mortgage Specialists, each retained copies of documentation containing confidential information about Mortgage Specialists' customers and their mortgages. While Davey and Carbone were working for Mortgage Partners, Mortgage Specialists received reports from customers that Mortgage Partners "had been contacting them, discussing confidential information with them, reporting that Mortgage Specialists had no license and was in trouble in New Hampshire, and luring them to do business with Mortgage Partners." Carbone admitted that he "informed Mortgage Specialists' customers that Mortgage Specialists was operating without the proper New Hampshire licensing." Since leaving Mortgage Specialists, both Davey and Carbone have used confidential information taken from Mortgage Specialists to contact Mortgage Specialists' customers and solicit business on behalf of Mortgage Partners. The defendants have also solicited Mortgage Specialists' employees.

Prior to trial, the defendants moved to dismiss Mortgage Specialists' claims, arguing in part that the New Hampshire Uniform Trade Secrets Act, see RSA ch. 350-B (NHUTSA), preempted Mortgage Specialists' claims for conversion, tortious interference with advantageous relations, violation of the CPA, and breach of fiduciary duty. See RSA 350-B:7. The trial court construed RSA 350-B:7 as providing that any of Mortgage Specialists' claims that are "based upon the [defendants'] alleged misappropriation of [Mortgage Specialists'] trade secrets are preempted" by the NHUTSA. Finding that the common law and CPA claims were not "supported by facts other than the misappropriation or misuse of trade secrets . . . and/or confidential information," the trial court concluded that the claims were preempted by the NHUTSA. In response to Mortgage Specialists' argument that dismissal of the common law and CPA claims would be premature, given that the parties continued to dispute whether the confidential information at issue was in fact a trade secret within the meaning of the NHUTSA, the trial court ruled that RSA chapter 350-B "displaces . . . claims that rely on the misappropriation of trade secrets, regardless of whether [Mortgage Specialists] successfully demonstrates that the information in question qualifies as a trade secret" within the meaning of the NHUTSA.

In reviewing the trial court's grant of a motion to dismiss, our task is to ascertain whether the allegations pled by Mortgage Specialists are reasonably susceptible of a construction that would permit recovery. See Berry v. Watchtower Bible & Tract Soc., 152 N.H. 407, 410 (2005). We assume that all facts pled are true, and we construe all reasonable inferences drawn from those facts in Mortgage Specialists' favor. See id.

We then engage in a threshold inquiry that tests those facts against the applicable law. *Id.* The issue raised here also involves the interpretation of a statute, which is a question of law that we review *de novo. See Woodview Dev. Corp. v. Town of Pelham*, 152 N.H. 114, 116 (2005).

On appeal, Mortgage Specialists argues that preemption pursuant to RSA 350-B:7 is contingent upon the information at issue qualifying as a trade secret within the meaning of the NHUTSA, *see* RSA 350-B:1, IV. Accordingly, it argues that the trial court prematurely dismissed the common law and CPA claims because the parties disputed whether the misappropriated information was a "trade secret" within the meaning of the NHUTSA. Alternatively, Mortgage Specialists argues that, even if preemption is not contingent upon the finding of a statutory trade secret, the claims were not preempted because they were not based solely upon the defendants' alleged misappropriation of statutory trade secrets, but also upon the defendants' alleged misappropriation of confidential information and goodwill and improper competition for customers.

The defendants argue that, pursuant to RSA 350-B:7, the NHUTSA preempts all "other remedies and theories of recovery in which liability is premised upon misappropriation of 'confidential information and trade secrets'" because all such remedies conflict with the NHUTSA. Accordingly, they argue that because "every one of [Mortgage Specialists'] claims [is] based entirely on the alleged misappropriation of alleged 'trade secrets' or 'confidential and proprietary' information," each of the common law and CPA claims is preempted by the NHUTSA.

We begin our review by interpreting RSA 350-B:7. In matters of statutory interpretation, we are the final arbiters of the legislature's intent as expressed in the words of the statute considered as a whole. *Woodview Dev. Corp.*, 152 N.H. at 116. We examine the language of the statute, ascribing to its words their plain and ordinary meanings, and interpret it in the context of the overall legislative scheme and not in isolation. *In the Matter of Jerome & Jerome*, 150 N.H. 626, 628-29 (2004). The NHUTSA, which is New Hampshire's codification of the Uniform Trade Secrets Act (UTSA) (amended 1985), 14 U.L.A. 536-659 (2005), must be construed "to effectuate its general purpose to make uniform the law with respect to the subject of [the NHUTSA] among states enacting it." RSA 350-B:8. Therefore, opinions rendered by courts interpreting the UTSA's preemption provision inform our analysis. *See id.*

RSA 350-B:7, entitled "Effect on Other Law," states:

> I. Except as provided in paragraph II, this chapter displaces conflicting tort, restitutionary, and other law of this state providing civil remedies for misappropriation of a trade secret.

II. This chapter shall not affect:

(a) Contractual remedies, whether or not based upon misappropriation of a trade secret;

(b) Other civil remedies that are not based upon misappropriation of a trade secret; or

(c) Criminal remedies, whether or not based upon misappropriation of a trade secret.

This provision of the NHUTSA is identical to section seven of the UTSA. *See* 14 U.L.A. 651. Hereinafter, we refer to the two provisions interchangeably as "the preemption provision."

Mortgage Specialists urges us to construe the preemption provision to provide that no claim is preempted unless and until a determination is made that there has been a misappropriation of trade secrets in violation of the NHUTSA. We acknowledge that, if read in isolation, the plain language of RSA 350-B:7, I, appears to support Mortgage Specialists' argument because it explicitly preempts only remedies for "misappropriation of a *trade secret*." (Emphasis added.) However, such a narrow construction of the preemption provision ignores not only the overall legislative scheme reflected in the NHUTSA, but also the statutory directive that we must construe the NHUTSA "to effectuate its general purpose to make uniform the law with respect to the subject of [the NHUTSA] among states enacting it," RSA 350-B:8. Thus, in construing the language of the preemption provision, we must consider the purpose of the UTSA as well as the construction that other courts have given to the same provision.

Prior to enactment of the UTSA, the Patent Section of the American Bar Association began considering the need for "enactment of a uniform state law to protect against the wrongful disclosure or wrongful appropriation of trade secrets, *know-how* or *other information* maintained in confidence by another." UTSA, 14 U.L.A. 531-32 prefatory note (emphases added; quotation omitted). The UTSA arose out of concerns that development of law on the subject had been "uneven" and that there was "undue uncertainty concerning the parameters of trade secret protection, and the appropriate remedies for misappropriation of a trade secret." *Id.* at 531. The drafters explained that "[t]he contribution of the [UTSA] is substitution of *unitary definitions* of trade secret and trade secret misappropriation, and a single statute of limitations for the *various . . . theories of noncontractual liability* utilized at common law." *Id.* (emphases added).

The UTSA "also arose to create a uniform business environment that created more certain standards for protection of commercially valuable

information." *Auto Channel, Inc. v. Speedvision Network, LLC*, 144 F. Supp. 2d 784, 789 (W.D. Ky. 2001). "[T]he purpose of the preemption provision is to preserve a single tort action under state law for misappropriation of a trade secret as defined in the statute and thus to eliminate other tort causes of action founded on allegations of misappropriation of information that may not meet the statutory standard for a trade secret." *Burbank Grease Services, LLC v. Sokolowski*, 693 N.W.2d 89, 98 (Wis. Ct. App. 2005) (hereinafter *Burbank Grease I*), *rev'd in part*, 717 N.W.2d 781, 788-94 (Wis. 2006). As such, the UTSA "was meant to codify all the various common law remedies for theft of ideas." *Thomas & Betts Corp. v. Panduit Corp.*, 108 F. Supp. 2d 968, 971 (N.D. Ill. 2000) (quotation omitted); *see also Bliss Clearing Niagara v. Midwest Brake Bond*, 270 F. Supp. 2d 943, 948 (W.D. Mich. 2003). With the enactment of the UTSA, confidential information not rising to the level of a statutory trade secret was left largely unprotected by the law. *See* RSA 350-B:7, I.

Mortgage Specialists urges us to adopt the position of a minority of courts that have held that common law and statutory claims are not preempted by the UTSA if they involve information that does not meet the statutory definition of a trade secret. *See, e.g., Callaway Golf v. Dunlop Slazenger Group Americas*, 295 F. Supp. 2d 430, 437 (D. Del. 2003); *Stone Castle v. Friedman, Billings, Ramsey & Co.*, 191 F. Supp. 2d 652, 659 (E.D. Va. 2002); *Combined Metals of Chicago Ltd. v. Airtek, Inc.*, 985 F. Supp. 827, 830 (N.D. Ill. 1997); *see also Burbank Grease Services, LLC v. Sokolowski*, 717 N.W.2d 781, 788-94 (Wis. 2006) (hereinafter *Burbank Grease II*). We do not find these cases persuasive, however, and the weight of authority among courts that have considered the preemption provision is that the history, purpose, and interpretation of the statutory scheme, as discussed above, do not support Mortgage Specialists' position. *See, e.g., Weins v. Sporleder*, 605 N.W.2d 488, 491-92 (S.D.), *cert. denied*, 531 U.S. 821 (2000); *Ethypharm S.A. France v. Bentley Pharmaceuticals*, 388 F. Supp. 2d 426, 433 (D. Del. 2005); *see also, e.g., Burbank Grease II*, 717 N.W.2d at 798-803 (Bradley, J., dissenting); *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 898 (Del. 2002) (rejecting argument that preemption is contingent upon finding of statutory trade secret); *Bliss Clearing Niagara*, 270 F. Supp. 2d at 948-49 (same); *Auto Channel*, 144 F. Supp. 2d at 788-89 (same); *Thomas & Betts*, 108 F. Supp. 2d at 972-73 (same). "If a common law claim for unauthorized use of information that did not meet the statutory definition of a trade secret were permitted, the result 'would undermine the uniformity and clarity that motivated the creation and passage of the [UTSA].'" *Burbank Grease I*, 693 N.W.2d at 99 (*quoting Auto Channel*, 144 F. Supp. 2d at 789).

Although we rely upon the opinion of the Court of Appeals of Wisconsin in *Burbank Grease Services, LLC v. Sokolowski*, we acknowledge that the Wisconsin Supreme Court recently reversed the portion of that opinion which is relevant to the issue presented here. *See Burbank Grease II*, 717 N.W.2d at 788-94. There, the supreme court held that Wisconsin's version of the UTSA does not preempt civil remedies for the misappropriation of information "if the information does not meet the statutory definition of a trade secret." *Id.* at 785. As noted above, while other courts have agreed with the Wisconsin Supreme Court, we do not find that position persuasive. Rather, we believe that the opinion of the Court of Appeals of Wisconsin in *Burbank Grease I* is well-reasoned, particularly for its adherence to the principles of uniformity and clarity that motivated the creation of the UTSA, in light of the legislative directive that the UTSA be construed to make uniform the law among the jurisdictions enacting it. *See Burbank Grease I*, 693 N.W.2d at 97-102; *see also Burbank Grease II*, 717 N.W.2d at 798-803 (Bradley, J., dissenting). We find the opinion of the Wisconsin Court of Appeals persuasive. *See Burbank Grease I*, 693 N.W.2d at 97-102.

■ We conclude that RSA 350-B:7, viewed in the context of the overall legislative scheme and construed in a manner that effectuates the purpose of making uniform the law among States that have adopted the UTSA, provides that the NHUTSA preempts claims that are based upon the unauthorized use of information, regardless of whether that information meets the statutory definition of a trade secret. Thus, except as otherwise provided in RSA 350-B:7, II, the NHUTSA essentially creates a system in which "information is classified only as either a protected 'trade secret' or unprotected 'general . . . knowledge.'" Unikel, *Bridging the "Trade Secret" Gap: Protecting "Confidential Information" not Rising to the Level of Trade Secrets*, 29 LOY. U. CHI. L.J. 841, 867-68 (1998). Although this result may seem harsh, we note that RSA 350-B:7, II(a) continues to permit individuals and corporate entities to protect their valuable commercial information *contractually*, regardless of whether such information meets the statutory definition of "trade secret" in the NHUTSA.

■ Accordingly, we agree with the trial court's conclusion that the preemption provision did not require that it make a determination of whether the information at issue constituted a trade secret under the NHUTSA prior to determining whether any of Mortgage Specialists' common law or CPA claims was preempted by the NHUTSA.

Our review, however, does not end here. As noted above, Mortgage Specialists argues that, even if preemption is not contingent upon the finding of a statutory trade secret, its claims were not preempted because

they were not based solely upon the defendants' alleged misappropriation of customer information, but also upon the defendants' alleged misappropriation of goodwill and improper competition for customers. It also argues that, to the extent that any one of its claims is based solely upon the misappropriation of customer information, the "confidential" nature of that customer information entitles it to special protection under New Hampshire law, independent of the NHUTSA. The defendants, however, argue that Mortgage Specialists' "claims for conversion, tortious interference, unfair trade practices and breach of fiduciary duty based on the alleged misuse of confidential information are no longer available in New Hampshire," by virtue of the preemption provision of the NHUTSA. We are not persuaded that the preemption provision should be applied this broadly.

■ Whether a particular claim is preempted by the NHUTSA turns on whether the claim "conflicts" with the NHUTSA. *See* RSA 350-B:7, I. The majority of courts that have examined this issue have not relied upon the label attached to the claim, but have examined the facts underlying the claim to determine whether it is preempted by the UTSA. *Burbank Grease I*, 693 N.W.2d at 99; *see also Weins*, 605 N.W.2d at 491; *Bliss Clearing Niagara*, 270 F. Supp. 2d at 946-47.

Some courts have stated that all claims that are factually related to the misappropriation of information are preempted. *See Powell Products, Inc. v. Marks*, 948 F. Supp. 1469, 1474 (D. Colo. 1996) (discussing cases in which courts have done so). However, we disagree with those courts. "The preemption provisions can be somewhat worrisome if they are applied mechanistically or overly conceptually. Our common law is richly flexible in redressing wrongs for improper conduct which in full or in part involves the use of information derived from the plaintiff." 1 R. MILGRIM, MILGRIM ON TRADE SECRETS § 1.01[3][a] at 1-128.3 (2002). "It is neither necessary nor prudent to preclude all common law claims that are connected with the misappropriation of what a plaintiff claims are trade secrets." *Powell Products*, 948 F. Supp. at 1474.

■ In determining whether a claim "conflicts" with the UTSA, we agree with the majority of courts, which have looked to the facts alleged or proved in support of the claim and have found that the claim is preempted when it is "based solely on, or to the extent [that it is] based on, the allegations or the factual showings of unauthorized use of . . . information or misappropriation of a trade secret." *Burbank Grease I*, 693 N.W.2d at 100 n.12; *see, e.g., Savor*, 812 A.2d at 898; *Frantz v. Johnson*, 999 P.2d 351, 357 & n.3 (Nev. 2000); *Weins*, 605 N.W.2d at 492; *Ethypharm*, 388 F. Supp. 2d at 433; *Bliss Clearing Niagara*, 270 F. Supp. 2d at 946; *Auto Channel,*

144 F. Supp. 2d at 789. We also agree with courts that have concluded that a claim is not preempted where the elements of the claim require some allegation or factual showing in addition to that which forms the basis for a claim of misappropriation of a trade secret. *See, e.g., Weins*, 605 N.W.2d at 492; *Ethypharm*, 388 F. Supp. 2d at 434-35; *Powell Products*, 948 F. Supp. at 1474; *see also Burbank Grease I*, 693 N.W.2d at 100 n.12.

Mortgage Specialists contends that, despite the foregoing, its claims are not preempted by the NHUTSA, even to the extent that they rely upon allegations of misappropriation of customer information. It argues first that we have "long recognized a distinction between a claim for the misappropriation of trade secrets and the misappropriation of confidential information," citing *Vigitron, Inc. v. Ferguson*, 120 N.H. 626, 631-32 (1980). It also argues that we have "indicated that among the panoply of legitimate interests of an employer which may be protected from competition is 'confidential information communicated by the employer to the employee, but not involving trade secrets,'" quoting *National Employment Service Corporation v. Olsten Staffing Service, Inc.*, 145 N.H. 158, 160 (2000). However, the language relied upon by Mortgage Specialists from both *Vigitron* and *Olsten Staffing* is not as broad as it contends.

In *Vigitron*, the defendants formed a partnership to sell products that would compete with the plaintiff's products and attempted to sell one of the competing products, all while at least one of the defendants was employed by the plaintiff. *Vigitron*, 120 N.H. at 631. We held that, although the defendants may not have disclosed the plaintiff's trade secrets, the plaintiff's right to injunctive relief arose from the defendants' breach of a confidential relationship with the plaintiff, and not from the use or disclosure of any trade secrets. *Id.* at 631-32. There, it was not the defendants' misappropriation of confidential information that gave rise to the action, but rather their breach of the confidential relationship they had with their employer while still employed by that employer. Here, the defendants were no longer employed by Mortgage Specialists when they allegedly misappropriated its confidential information. Furthermore, we note that *Vigitron* was decided prior to New Hampshire's enactment of the NHUTSA. Thus, to the extent that *Vigitron* could be read to create a distinct cause of action for the misuse of confidential information not rising to the level of a trade secret, it has since been preempted by the NHUTSA for the reasons discussed above—the common law no longer protects confidential information from mere misuse unless it is a statutory trade secret.

In *Olsten Staffing*, we examined the validity of a restrictive covenant contained in a contract between an employer and its employees. *Olsten Staffing*, 145 N.H. at 160-61. We noted that a covenant between an employer and employee is valid only to the extent that it protects legitimate interests of an employer, which interests include maintaining the confidentiality of the employer's confidential information. *Id.* at 160. While this language provides that an employer may protect his or her confidential information through *contracts* with employees, it does not recognize an independent cause of action for misappropriation of confidential information. Furthermore, the NHUTSA preemption provision explicitly exempts contractual claims from preemption, regardless of whether the information involved is a statutory trade secret. RSA 350-B:7, II(a).

We conclude that, to determine whether a plaintiff's claims are preempted by the NHUTSA, a court must examine the facts alleged in support of each claim to determine the extent to which the claim is based upon the misappropriation of trade secrets or other information. Accordingly, we will examine Mortgage Specialists' common law and CPA claims and the facts alleged in support of each to determine whether each claim is based solely upon the misappropriation of Mortgage Specialists' customer information.

Mortgage Specialists' writ claims that Davey and Carbone are liable for conversion because they "have exercised dominion and control over Mortgage Specialists' property and assets so as to deprive Mortgage Specialists of dominion and control of same." The only factual allegations supporting the conversion claim, however, are that Davey and Carbone took Mortgage Specialists' customer information. Even if there are sufficient factual allegations in the writ to support a claim for conversion, the claim is preempted by the NHUTSA because it is based entirely upon the misappropriation of customer information.

Mortgage Specialists' writ next claims that the defendants are liable for tortious interference with advantageous relations because: (1) "Mortgage Specialists has advantageous, economic, business and contractual relations with its customers"; (2) "[d]efendants are aware of those relationships"; and (3) "[d]efendants . . . [have] taken action to induce the disruption or termination of such economic, business and/or contractual relations." Unlike Mortgage Specialists' conversion claim, this claim is not based solely upon the defendants' alleged misuse of Mortgage Specialists' customer information. This claim is supported by the allegation that the defendants intentionally contacted Mortgage Specialists'

customers, with whom it claimed to have advantageous relations, and persuaded them to do business with the defendants. The claim is also supported by the allegation that Carbone informed Mortgage Specialists' customers that it was not properly licensed in the State, as well as the allegation that the defendants solicited Mortgage Specialists' employees. Thus, to the extent that the tortious interference claim is supported by more than the mere misuse of Mortgage Specialists' customer information, it is not preempted. *See, e.g., Ethypharm,* 388 F. Supp. 2d at 434-35 (finding claim for intentional interference with actual and prospective business relationships not preempted by UTSA); *Bliss Clearing Niagara,* 270 F. Supp. 2d at 949-50 (finding claim for tortious interference not preempted by UTSA).

Next, Mortgage Specialists' writ claims that the defendants are liable for violation of the CPA because "[t]he actions of [the] defendants constitute unfair trade practices within the meaning of [the CPA]." The CPA prohibits the "use [of] any unfair method of competition or any unfair or deceptive act or practice in the conduct of any trade or commerce within this state." RSA 358-A:2 (Supp. 2005). Such conduct includes, but is not limited to, the specific acts listed in RSA 358-A:2, I-XIV, including "[d]isparaging the goods, services, or business of another by false or misleading representation of fact." RSA 358-A:2, VIII. Like Mortgage Specialists' tortious interference claim, its claim for violation of the CPA is not based solely upon the defendants' alleged misuse of Mortgage Specialists' customer information. This claim is supported by the allegation that Carbone informed Mortgage Specialists' customers that it was not properly licensed in the State. Thus, to the extent that the CPA claim is supported by more than the mere misuse of customer information, it is not preempted.

Finally, Mortgage Specialists' writ claims that Davey and Carbone are liable for breach of fiduciary duty because Mortgage Specialists entrusted them with confidential customer information, that trust gave rise to a fiduciary duty in them, and, "through their conduct," they breached that duty to Mortgage Specialists. The only factual allegations supporting the fiduciary duty claim, however, are that Davey and Carbone took and used Mortgage Specialists' customer information. Mortgage Specialists contends in its brief that there was evidence at trial "that the defendants conspired ... with ... Mortgage Partners during their employment at Mortgage Specialists, and that Carbone acquired a substantial amount of Form 1003s during his last days of employment for the sole purpose of providing this information to Mortgage Partners." However, we note that even if these facts were sufficient to overcome a

motion to dismiss, such facts were not alleged in Mortgage Specialists' writ, and thus we cannot consider them in our review of the trial court's grant of the defendants' motion to dismiss. Therefore, because the factual allegations in Mortgage Specialists' writ involve only the misappropriation of customer information, the claim is preempted by the NHUTSA.

The defendants' remaining arguments on this issue are without merit and do not warrant further discussion. *See Vogel v. Vogel*, 137 N.H. 321, 322 (1993). We thus vacate the trial court's dismissal of Mortgage Specialists' claims for tortious interference and violation of the CPA, and remand to the trial court for further proceedings consistent with this opinion.

## IV. Sanctions

The defendants cross-appeal the trial court's post-trial order assessing sanctions against them for: (1) the destruction of the copies of the loan applications that they had taken when they departed from Mortgage Specialists; (2) the origination and closing of loans in violation of the trial court's preliminary injunction order; and (3) the failure to produce client lists in violation of the trial court's discovery order. For the reasons discussed below, we vacate the trial court's order on the motion to reconsider with respect to the sanctions for destruction of documents as well as the order with respect to the sanction for the violation of the preliminary injunction, and remand.

The record reflects the following facts relevant to the trial court's imposition of sanctions: When Davey and Carbone left Mortgage Specialists in July 2002, both took copies of an unknown number of documents that contained information about Mortgage Specialists' customers. In November 2002, during their depositions in the Mortgage Partners litigation, Davey and Carbone admitted to having the copies in their possession. Neither Davey nor Carbone was asked or ordered to return or secure the copies before, during, or after the deposition.

Sometime after the November 2002 deposition, Davey and Carbone each destroyed the copies that he had in his possession. Davey testified that he shredded his copies shortly after the deposition. Carbone testified that he had his copies destroyed by a document destruction company sometime prior to April 2003. However, one of Carbone's former employees testified that Carbone's copies were stored at the Signature Mortgage office until June 2003. The employee testified that Carbone told him in June 2003 that the documents had been shredded the previous night because the documents "got a little too hot to have around." Carbone denied the employee's allegations.

Mortgage Specialists' suit against the defendants was filed in February 2003. On April 16, 2003, the trial court issued a preliminary injunction order enjoining the "[d]efendants, and their employees, agents and affiliates, or anyone acting by or through them" from, among other things, "contacting, soliciting or otherwise communicating with any customers or former customers of [Mortgage Specialists]" except in limited circumstances. Davey and Carbone both originated and closed loans in violation of the court's order.

On September 15, 2004, in response to a motion for contempt filed by Mortgage Specialists in relation to an earlier discovery order, the trial court ordered the defendants to allow Mortgage Specialists' counsel to inspect the defendants' computers for customer lists. The next day, Mortgage Specialists filed a supplemental motion for contempt, entry of default judgment and sanctions. In that motion, Mortgage Specialists alleged that the defendants had engaged in discovery abuse by falsely claiming that they could not produce customer lists from their computers, and asked the trial court to impose sanctions. Mortgage Specialists also alleged that the customer lists retrieved from the defendants' computers confirmed that the defendants had been violating the trial court's preliminary injunction order by closing loans for Mortgage Specialists' customers after the date of the order, and asked the trial court to impose sanctions for this conduct as well. The record on appeal does not include any hearing transcripts or orders regarding this motion, and the post-trial order on sanctions indicates only that the trial court "withheld judgment on the issue of sanctions until after hearing the testimony presented at trial."

The trial commenced on September 20, 2004. The trial court heard testimony regarding the violations of the preliminary injunction, as well as testimony regarding the defendants' destruction of their copies of documents containing information about Mortgage Specialists' customers. The trial concluded on September 28, 2004.

On October 6, 2004, Mortgage Specialists filed a motion for sanctions and other relief, which restated the allegations contained in its supplemental motion for contempt and further alleged that the defendants had "intentionally destroyed evidence" relating to Mortgage Specialists' claim. Mortgage Specialists asked the trial court to "[e]nter a default judgment against [the] defendants as [a] sanction for the destruction of evidence," to "[h]old [the] defendants in contempt" of the discovery order and preliminary injunction order, to award Mortgage Specialists "its costs and attorneys' fees" resulting from violation of the discovery order, to sanction the defendants in an amount equal to the profits received by the defendants on each loan closed in violation of the preliminary injunction

order "plus an appropriate sanction for the defendants' utter disregard" for the same order, and to award Mortgage Specialists damages in an amount "appropriate for these flagrant violations" of the trial court's orders and the discovery process.

The trial court held a hearing on the motion for sanctions on October 7, 2004. At the hearing, counsel for Mortgage Specialists emphasized the need to protect and vindicate the integrity of the court, stating that "these issues go to the heart of the process and the Court's integrity in the litigation process and the requirement for the parties in the litigation to play by the rules and to obey the orders of the court." Counsel further argued that violation of the preliminary injunction "goes to the very heart of the integrity of the process" and amounted to the defendants' "thumbing of their noses at [the trial] court's authority and the integrity of the process." Counsel concluded by arguing that the trial court should "send a message to [the defendants] that the integrity of the process has been violated." In the defendants' post-hearing objection to the motion for sanctions, filed October 12, 2004, they acknowledged Mortgage Specialists' emphasis on the integrity of the trial court, but contended that the "post-verdict attack on the Defendants is, respectfully, one founded in the interest of revenge, and not in vindicating the dignity of the Court."

The trial court ultimately sanctioned the defendants for the destruction of documents, violation of the preliminary injunction order, and violation of the discovery order. With respect to the destruction of documents, the trial court ruled as follows:

> Although the destruction of the documents caused no prejudice to the outcome of the case, the court finds the documents were destroyed in an effort to conceal information from the court and to thwart [Mortgage Specialists'] prosecution of its case. To make matters worse both Davey and Carbone lied under oath about the timing of the destruction of the documents. Based on all this, the court finds that both men and their companies acted in bad faith, caused the plaintiff to expend time and money to recreate the information, and most significantly injured the integrity of court proceedings. As a sanction, the court orders Davey and Carbone to reimburse the plaintiff $10,000 each for attorneys' fees and expenses. Additionally, because the defendants' actions jeopardize and undermine the integrity of the legal process, the court imposes fines of $20,000 against Davey and Team Mortgage and $40,000 against Carbone and Signature Mortgage. Carbone's fine is greater because the court finds his actions more egregious.

With respect to the violation of the preliminary injunction order, the trial court found that Davey and Carbone both violated the order and ruled as follows:

> Closing on loans originated after April 16, whether done in bad faith or through negligent policing procedures, was in violation of Judge Coffey's injunctive order and undermines the very foundation of our legal system. Accordingly, the court finds Davey and Carbone in contempt. Thus, in order to vindicate the integrity of the court, Davey [and Carbone are each] required to pay the court five times the "gross profit" on each of the loans that [he or his company originated and closed in violation of the preliminary injunction order].

Finally, the trial court sanctioned the defendants for their failure to comply with its discovery order to produce the customer lists, ordering them to pay Mortgage Specialists' reasonable attorney's fees and costs.

The defendants moved for reconsideration of the trial court's order on sanctions. They argued, for the first time, that the sanctions were improper and that the process had been flawed because the sanctions were for criminal, rather than civil, contempt. They also argued that the sanctions were excessive. The trial court reconsidered only the portion of its order relating to the violation of the preliminary injunction, reducing the sanctions from five to three times the defendants' gross profits on loans closed in violation thereof. The trial court rejected the argument that the sanctions were criminal in nature, but found that, even if the sanctions were criminal in nature, the defendants had not been denied due process. Nevertheless, the trial court also found "beyond a reasonable doubt that the defendants knowingly violated [the trial] court's injunction."

On appeal, the defendants argue that the trial court's imposition of fines and attorney's fees for the destruction of documents and for the violation of the preliminary injunction order constituted findings of criminal, rather than civil, contempt. They contend that the trial court found them in criminal contempt of court without adhering to the substantive and procedural requirements attendant to a finding of criminal contempt. Before we reach the merits of the defendants' argument, however, we must address Mortgage Specialists' argument that the defendants failed to preserve this issue for appellate review. *See State v. Blomquist*, 153 N.H. 216, 218, (2006). Mortgage Specialists argues that the defendants were aware of the nature of the sanctions sought by Mortgage Specialists prior to trial and failed to preserve the issue regarding the propriety of criminal contempt sanctions because they raised it for the first time in their motion for reconsideration.

■ We have recognized that "parties may not have judicial review of matters not raised at the earliest possible time." *State v. Tselios*, 134 N.H. 405, 407 (1991). "[T]he rationale behind the rule is that trial forums should have an opportunity to rule on issues and to correct errors before they are presented to the appellate court." *Id.* Accordingly, we have held that where an issue is raised for the first time in a motion for reconsideration and failure to raise the issue earlier did not deprive the trial court of a full opportunity to correct its error, the issue has been preserved for our review. *See, e.g., Gammans v. FHP Constructors*, 146 N.H. 702, 704 (2001); *Moulton-Garland v. Cabletron Systems*, 143 N.H. 540, 544 (1999); *Tselios*, 134 N.H. at 407. If, however, the trial court exercises its discretion to refuse to entertain the issue on reconsideration due to the party's failure to raise it at an earlier time, we will uphold that decision absent an unsustainable exercise of discretion. *Mt. Valley Mall Assocs. v. Municipality of Conway*, 144 N.H. 642, 654-55 (2000); *cf. State v. Lambert*, 147 N.H. 295, 296 (2001) (explaining unsustainable exercise of discretion standard).

The defendants did not argue that the sanctions proceedings were criminal in nature prior to or during the hearing on the motion for sanctions. They did, however, in their motion for reconsideration of the trial court's order on sanctions, argue that the trial court had failed to adhere to the requisite procedural and substantive formalities when it sanctioned the defendants for both the violation of the preliminary injunction and for the destruction of documents.

The trial court, at the hearing on the motion for reconsideration, opened by asking counsel for the defendants, "You are appealing all these decisions in the Mortgage Specialists versus Davey?" When counsel responded in the affirmative, the trial court stated, "All right. So I will hear you only on the violation of the ... injunctive order, at this time." Throughout the remainder of the hearing, no mention was made of the sanctions with respect to the destruction of documents.

In its order on the motion for reconsideration, the trial court noted, "I earlier assessed sanctions against the defendants for destroying evidence, violating an injunction, and discovery abuses. The defendant[s] moved for reconsideration, and I agreed only to reconsider my order regarding the defendants' violation of this court's restraining order." (Citation omitted.) The remainder of the order addressed only the defendants' claim that the sanctions for violation of the preliminary injunction were improper. The trial court neither granted nor denied the defendants' motion for reconsideration with respect to the sanctions for the destruction of documents.

From this review of the record, we conclude that the trial court was accorded an opportunity to rule on the propriety of the sanctions with respect to both the violation of the preliminary injunction and the destruction of documents. Therefore, because the trial court did not refuse to rule on the propriety of the sanctions with respect to the violation of the preliminary injunction, this issue was properly preserved for appellate review. *See Tselios*, 134 N.H. at 407; *compare id. with Mt. Valley Mall Assocs.*, 144 N.H. at 655. However, because we conclude from our review of the record that the trial court refused to entertain the same issue with respect to the destruction of documents, we review only whether the trial court's refusal to entertain the issue on reconsideration was an unsustainable exercise of discretion. *See Mt. Valley Mall Assocs.*, 144 N.H. at 654-55. Thus, we will reach the merits of the defendants' arguments that the trial court's imposition of sanctions amounted to a finding of criminal contempt to determine, first, whether the trial court unsustainably exercised its discretion in refusing to entertain the criminal contempt issues with respect to the destruction of documents on reconsideration, and second, whether the trial court erred by making a finding of criminal contempt for the violation of the preliminary injunction without adhering to the requisite substantive and procedural formalities.

In response to the defendants' arguments regarding the criminal nature of the trial court's imposition of sanctions, Mortgage Specialists first argues that the sanctions were for civil, rather than criminal, contempt, and thus the trial court was not required to adhere to the procedural formalities argued by the defendants. Whether a sanction amounts to a finding of indirect criminal contempt is a question of law, which we review *de novo. See Rogowicz v. O'Connell*, 147 N.H. 270, 272 (2001). Mortgage Specialists also argues that even if the sanctions were for criminal contempt, the trial court provided the defendants with all of the requisite procedural protections. Whether the trial court adhered to the requisite procedures in a criminal contempt proceeding is also a question of law, which we review *de novo. See id. But cf. State v. Lieber*, 146 N.H. 105, 106 (2001) (where trial court bypasses certain procedural formalities and instead utilizes summary contempt procedures, as is permitted in specific situations involving direct criminal contempt, its decision to do so will be upheld absent an unsustainable exercise of discretion).

The two classes of contempt, civil and criminal, are distinguishable by the character and purpose of the punishment imposed. *Bonser v. Courtney*, 124 N.H. 796, 808 (1984). In civil contempt, the purpose of the punishment is remedial, coercive, and for the benefit of the plaintiff. *Id.* The purpose of criminal contempt, however, is punitive and to

vindicate the "authority and dignity" of the court. *Id.* (quotation omitted). To be punished for criminal contempt, the defendant must have intentionally failed to comply with a valid order, of which the defendant had knowledge. *State v. Wallace*, 136 N.H. 267, 270-71 (1992).

Contempt is either direct or indirect. *Bonser*, 124 N.H. at 808. A direct contempt is one committed in the presence of the court and in its immediate view. *Id.* All elements of the contempt must be personally observable by the judge. *Id.* An indirect contempt is committed outside the presence of the court and without the judge having full personal knowledge of every element of the contempt. *Id.* Thus, indirect contempt arises from events of which the presiding judge could not take judicial notice. *Id.* The significance of the distinction between direct and indirect contempt lies in the procedural requirements to which the court must adhere. *Town of Nottingham v. Cedar Waters, Inc.*, 118 N.H. 282, 285 (1978).

A direct contempt may be punished summarily. *Id.*; *see* SUPER. CT. R. 95(a). Certain procedural formalities may be bypassed in light of the court's personal knowledge of the contemnor's conduct and because of the immediacy of the conduct and the need for prompt action. *Lieber*, 146 N.H. at 107. The summary contempt power, however, should be used only when the contemnor's conduct openly threatens the orderly procedure of the court or publicly defies its authority. *Town of Nottingham*, 118 N.H. at 285. The contumacious behavior must constitute a threat that *immediately* imperils the administration of justice. *Id.* at 285-86.

An indirect criminal contempt cannot be punished without adherence to certain procedural formalities. Generally, the proceeding must satisfy the procedural requirements of a criminal proceeding. *Rogowicz*, 147 N.H. at 273. The alleged contemnor must first be provided notice, stating the time and place of hearing and the essential facts constituting the criminal contempt charged, and describing the charge as one for criminal contempt. SUPER. CT. R. 95(b); *Town of Nottingham*, 118 N.H. at 286. The notice must also allow the defendant a reasonable time for the preparation of a defense. SUPER. CT. R. 95(b); *Town of Nottingham*, 118 N.H. at 286.

An action for indirect criminal contempt should be treated as a misdemeanor. *Town of Nottingham*, 118 N.H. at 286. The prosecutor must prove the elements of the case beyond a reasonable doubt. *Id.* The contemnor is entitled to be represented by counsel. *Id.* The right against self-incrimination also applies. *Id.* The contemnor is entitled to a jury trial if the court intends to punish the contempt by imposing a sentence greater

than six months in the house of correction if the contemnor is found guilty. *Id.*

■ "[C]riminal contempt proceedings arising out of civil litigation are between the public and the defendant, and are not a part of the original cause." *Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 804 (1987) (quotation omitted); *see Rogowicz*, 147 N.H. at 273. Although a criminal contempt proceeding may be initiated and prosecuted by a private attorney, *Rogowicz*, 147 N.H. at 273, the private attorney must be disinterested, *id.* at 274. A private attorney who represents the beneficiary of a court order cannot prosecute a criminal contempt action arising from that order. *Id.* at 274-75.

*A. Destruction of Documents*

With respect to the finding of criminal contempt for the destruction of documents, the defendants argue on appeal that: (1) the trial court failed to adhere to the requisite procedural safeguards in finding them in criminal contempt; (2) the finding of criminal contempt was improper because the documents in question were not subject to any preservation or discovery order and because the trial court found that the destruction was not prejudicial to Mortgage Specialists' case; and (3) the award of attorney's fees as a sanction for the destruction of documents was not supported by sufficient evidence. In their notice of appeal, the defendants also argue that the sanction imposed by the trial court for the destruction of documents was excessive. However, because the defendants did not adequately brief this issue, we decline to address it. *See Appeal of AlphaDirections*, 152 N.H. 477, 483-84 (2005).

As explained above, the defendants objected to the criminal nature of the sanctions for the destruction of documents for the first time in their motion for reconsideration. Prior to that time, they had not argued that the sanctions sought by Mortgage Specialists were for criminal contempt, that the trial court did not adhere to adequate procedures, or that an award of attorney's fees would be an improper sanction for the destruction of documents. Because the trial court refused to entertain the issue of the propriety of the sanctions for the destruction of documents, we review its refusal to do so on reconsideration for an unsustainable exercise of discretion. *See Mt. Valley Mall Assocs.*, 144 N.H. at 654; *cf. Lambert*, 147 N.H. at 296 (explaining unsustainable exercise of discretion standard). The trial court's decision is not sustainable if it is "clearly untenable or unreasonable to the prejudice of [the defendants'] case." *Lambert*, 147 N.H. at 296 (quotation omitted).

The trial court's order imposing sanctions upon the defendants suggests that the trial court may have made an improper finding of indirect criminal contempt with respect to the destruction of documents. It appears that the fines were punitive in nature because the trial court separately ordered the defendants to reimburse Mortgage Specialists for attorney's fees. Although it is not clear from the trial court's order to whom these fines were to be paid, it appears that they were to be paid to the court. The other fines imposed by the trial court in the same order were all to be paid to the court, and the trial court did not order that these fines be paid to Mortgage Specialists, as it had done with the attorney's fees. The increased fine imposed upon Carbone, because the trial court found his actions to be more egregious, further indicates that the fines were punitive and not remedial in nature. In imposing these fines, the trial court found that the defendants "injured the integrity of court proceedings." All of this is indicative of a finding of indirect criminal contempt.

The trial court also appears to have failed to adhere to the requisite procedural formalities in arriving at this finding of indirect criminal contempt. While the trial court heard evidence regarding the destruction of documents during the course of the trial, the first notice to the defendants of the potential for sanctions on this issue appears to have been provided some time after the evidence was presented, possibly as late as Mortgage Specialists' post-trial motion for sanctions. Although the trial court appears to have based the imposition of fines in part upon its finding that the defendants lied under oath about the timing of the destruction of documents, Mortgage Specialists did not specifically allege this factual basis for the imposition of sanctions in its post-trial motion for sanctions. Neither Mortgage Specialists nor the trial court ever described the claims against the defendants as charges of criminal contempt. Finally, it appears that the trial court either erroneously attempted to utilize summary procedure or, instead, permitted Mortgage Specialists to prosecute the contempt despite its status as an interested party.

■■■ The procedures utilized by the trial court in imposing sanctions for the destruction of documents were at least irregular. More importantly, although the defendants may have been able to raise the issue of the propriety of sanctions at an earlier time than on reconsideration, it appears that the defendants did not have sufficient notice of the actual nature of the proceedings prior to the trial court's order imposing sanctions. Given the foregoing, and given the unusual circumstances of this case—that the inadvertent imposition of sanctions for indirect criminal contempt is exceedingly rare, and that trial courts have little guidance as to how to handle such a situation beyond this court's opinion in *Town of*

*Nottingham,* 118 N.H. at 286-87—we conclude that the trial court committed an unsustainable exercise of discretion in refusing to entertain these issues on reconsideration. In light of this conclusion, we need not address the defendants' argument that we should review this issue for plain error. *See* SUP. CT. R. 16-A.

## B. Violation of the Preliminary Injunction

With respect to the finding of criminal contempt for the violation of the preliminary injunction, the defendants argue on appeal that: (1) the trial court failed to adhere to the requisite procedural safeguards in finding the defendants in criminal contempt; (2) the finding of criminal contempt was erroneous because there was insufficient evidence to support the trial court's finding beyond a reasonable doubt that the defendants willfully violated the preliminary injunction order; and (3) the fines imposed as a sanction for violation of the preliminary injunction were excessive.

The sanctions for the defendants' violation of the preliminary injunction presuppose a finding of criminal contempt. The fines imposed by the trial court—three times the gross profit earned on loans originated and closed in violation of the order—were punitive in nature. The fines were neither remedial nor for the benefit of Mortgage Specialists, as they were not to be paid to Mortgage Specialists. The fines were not coercive, as the preliminary injunction order was presumably dissolved when the jury returned a verdict in the defendants' favor. Most importantly, the language of the trial court's order clearly states that the trial court chose to impose these fines "in order to vindicate the integrity of the court" rather than to vindicate the rights of the parties. *See Town of Epping v. Harvey,* 129 N.H. 688, 691-92 (1987).

The sanctions were also for indirect, rather than direct, criminal contempt. The trial court fined the defendants because they "[c]los[ed] on loans originated after April 16," in violation of the preliminary injunction order. Thus, the alleged contempt was committed outside the presence of the trial court and without the trial court having full personal knowledge of every element of the contempt. *See Bonser,* 124 N.H. at 808.

Because the sanctions were for indirect criminal contempt, the trial court was required to adhere to the procedural formalities attendant thereto. We conclude that the trial court did not do so.

It is unclear whether the defendants received the requisite notice. Given that the various motions filed by Mortgage Specialists sought punitive sanctions, the defendants could have understood that Mortgage Specialists was seeking a finding of criminal contempt from the trial court. However, prior to the defendants' motion for reconsideration, the words

"criminal contempt" were never uttered by Mortgage Specialists or the trial court. Notice of the essential facts constituting the contempt charged and the nature of the punishment sought may be insufficient to provide a defendant adequate notice that he faces a charge of criminal contempt where the notice does not describe the charge as one for criminal contempt. *See* SUPER. CT. R. 95(b); *Town of Nottingham*, 118 N.H. at 286.

Moreover, even if the notice was adequate, the trial court erred in failing to refer the matter for prosecution and in permitting Mortgage Specialists to present evidence and argument regarding the criminal contempt charges against the defendants. Although the beneficiary of a court order, or counsel representing the beneficiary, may argue to the court that criminal contempt charges arising from that order should be referred to a public or private prosecutor for prosecution, he or she cannot actually prosecute those charges. *See Rogowicz*, 147 N.H. at 274-75; *see also, e.g., State ex rel. Koppers v. Intern. Union, Etc.*, 298 S.E.2d 827, 830 (W. Va. 1982); *Peterson v. Peterson*, 153 N.W.2d 825, 830 (Minn. 1967); *Ramos Colon v. U.S. Atty. for D. Puerto Rico*, 576 F.2d 1, 5 (1st Cir. 1978). Criminal contempt is collateral to the proceeding out of which the contempt arose, "and the parties to the action out of which the alleged criminal contempt arose have no interest in it." *Peterson*, 153 N.W.2d at 830. Thus, with the exception of the limited cases of criminal contempt that may be adjudicated utilizing summary procedure, *see Town of Nottingham*, 118 N.H. at 285-86, "criminal contempt should, in the first instance, be referred to the executive branch for prosecution." *Rogowicz*, 147 N.H. at 273. While the trial court may choose not to refer the case for prosecution, it may not allow the beneficiary of the court order or his or her counsel to continue to pursue sanctions that are in the nature of criminal, rather than civil, contempt. *See id.* at 274-75.

Accordingly, the trial court here erred in permitting Mortgage Specialists to prosecute the charges that constituted criminal contempt. We therefore vacate the trial court's order of sanctions for violation of the preliminary injunction, and remand this portion of the case to the trial court for further proceedings consistent with this opinion.

Because we remand the trial court's order of sanctions for the violation of the preliminary injunction on procedural grounds, we need not address the defendants' remaining arguments pertaining to these sanctions.

*C. Violation of the Discovery Order*

In their notice of appeal, the defendants argue that the sanction imposed by the trial court for violation of the discovery order was incorrect and excessive. However, the defendants did not adequately brief these issues,

and thus we decline to address them. *See AlphaDirections*, 152 N.H. at 483-84.

*Affirmed in part; vacated in part; and remanded.*

BRODERICK, C.J., and DUGGAN, GALWAY and HICKS, JJ., concurred.