Belknap
No. 2008-073

New Hampshire Ball Bearings, Inc.

v.

W. Scott Jackson & a.

Argued: January 9, 2009
Opinion Issued: March 18, 2009

*Orr & Reno, P.A.*, of Concord (*Lisa Snow Wade* on the brief and orally), for the plaintiff.

*Cook, Little, Rosenblatt & Manson P.L.L.C.*, of Manchester (*Arnold Rosenblatt* and *Daphne Lessard* on the brief, and *Mr. Rosenblatt* orally), for defendant W. Scott Jackson.

*Downs Rachlin Martin P.L.L.C.*, of Littleton (*Kate Strickland* on the brief), and *Snell & Wilmer L.L.P.*, of Phoenix, Arizona (*Sid Leach* on the brief and orally), for defendant Sargent Controls and Aerospace.

DUGGAN, J. The plaintiff, New Hampshire Ball Bearings, Inc. (NHBB), appeals decisions of the Superior Court (*Smukler*, J.) concerning discovery motions, evidentiary rulings, jury instructions and the denial of post-trial motions. We affirm.

### I. Pre-Trial Proceedings

NHBB initiated this suit in early May 2006, alleging that W. Scott Jackson, a former NHBB employee, breached his confidentiality agreement by taking approximately fifty-three NHBB computer files when he left the company, and that Jackson and his current employer, Sargent Controls and Aerospace (Sargent), misappropriated NHBB trade secrets. The parties engaged in a lengthy and bitterly fought discovery process. At

the start of the case, the trial court issued two orders requiring the defendants to preserve all evidence relevant to the case. After seven months of discovery, NHBB filed a motion to compel Sargent to grant NHBB access to its servers, server backup tapes and employee computers in all three of Sargent's engineering divisions at its facility in Tucson, Arizona. The court denied the request, stating that the potential imaging of up to 250 hard drives was "too broad and burdensome," but allowed NHBB to make a narrower request. NHBB renewed its request to include all Sargent backup tapes and servers, but only thirty-five employee computers. The thirty-five computers were those used in the Kahr Bearing Engineering Group, the Sargent division dedicated to manufacturing bearings. The trial court granted NHBB's revised request in March 2007.

The parties, however, disputed their obligations under the order. Sargent allowed NHBB access to the thirty-five hard drives in April, but refused access to its servers or backup tapes. In late May, the trial court clarified its order to include the backup tapes, but not Sargent's servers; the trial court ordered Sargent to produce the backup tapes. In late August, one month before trial, Sargent filed a motion *in limine* requesting the exclusion of evidence concerning discovery disputes under New Hampshire Rules of Evidence 401, 402 and 403. Over NHBB's objection, the trial court granted Sargent's motion. On appeal, NHBB challenges the trial court's rulings concerning discovery and the granting of the defendants' motion *in limine*.

## II. Trial

The jury could have found the following facts. Jackson worked for NHBB in various engineering capacities for over twenty years. During December 2005 and January 2006, Harry Labbe, a former NHBB employee then working at Sargent, recruited Jackson and convinced him to apply for the position of northeast sales manager. On January 29, 2006, Jackson returned from an interview with Sargent in Tucson, Arizona, and accepted a position with Sargent on February 1. Jackson resigned from NHBB on February 1 and returned his NHBB-issued laptop (NHBB laptop).

One month after he left, NHBB employees created a forensic image of Jackson's NHBB laptop as part of a forensic training course. A forensic image is an exact replica, bit for bit, of the original storage device that allows investigation of past use without altering the original evidence. Analysis of the forensic image with forensic software allows an investigator to determine what peripheral devices have been connected to the device, what a user accessed, what has been stored on the device, and when it was last accessed or modified. Because deleted files are not actually erased from storage media, analysts are able to determine both current and deleted files

so long as the latter have not been completely overwritten with new data. When the NHBB laptop was imaged, however, the equipment operator failed to activate the write blocker on the imaging equipment, thereby changing the last access dates for certain system files.

Analysis of the forensic image showed that after returning from Tucson on the night of January 29, Jackson twice remotely accessed NHBB's virtual private network (VPN), and serially accessed a number of files on the NHBB laptop. Each logon to the VPN lasted only a few minutes, and Jackson testified that he had checked his NHBB email that night. Witnesses testified that his brief VPN access with limited data transmission was consistent with retrieving email and not downloading files. Serial access occurs when a user accesses multiple files at the same time, thereby creating the same last access date for each file. NHBB's expert testified that the most probable cause of serial access is copying files; Sargent's expert, however, discussed other possible causes, such as simply selecting or moving files. Of those files serially accessed, NHBB identified roughly fifty-three that it believed to contain trade secrets or confidential information. Those files contained employee performance reviews as well as a number of documents used in computer-aided engineering including: engineering formulas, NHBB part specifications, production specifications and information on customers' products and requirements. There was nothing suspect about Jackson possessing such files during his employment, as they were either placed on the laptop by NHBB or created while working on NHBB projects. The other serially accessed files were Jackson's personal files. The image also showed that a Lexar flash drive was connected to the NHBB laptop the night of January 29.

Based largely upon recovered emails between Labbe and Jackson during his recruitment, Jackson's remote VPN access, the serial access of files on the NHBB laptop, and the use of a peripheral flash drive, NHBB filed suit in May 2006, alleging misappropriation of trade secrets. The trial court issued an order for all parties to preserve any evidence related to the case.

In late 2006, NHBB requested that Jackson turn over for imaging his digital camera, the Lexar flash drive, his wife's laptop (Jackson laptop), his PDA — personal digital assistant, containing his contacts and date planner — his wife's mp3 player, and additional flash drives that were connected to the NHBB or Jackson laptops at various times. Jackson and his wife testified that the additional flash drives belonged to their children and had been lost or destroyed. Jackson did, however, produce one additional flash drive during trial in September 2007, after his wife found it in her son's room at her ex-husband's house.

Comparison of the NHBB laptop and Lexar flash drive images showed that some, but not all, of the serially accessed files were copied from the

NHBB laptop to the flash drive. Jackson testified that after he decided to resign at NHBB, he took all of his personal files off the NHBB laptop using the flash drive and transferred them to the Jackson laptop. The images showed that the files copied on the night of January 29 were predominantly personal files, such as Jackson's photographs, country club documents, and divorce and marriage records, though NHBB claimed other NHBB files were taken over a period of time.

The image also showed that at least two NHBB documents were taken from the NHBB laptop and created and opened on the flash drive as Microsoft Excel spreadsheets. NHBB's expert testified that subsequent activity on the flash drive made it difficult to determine which, if any, other NHBB files were copied. The two copied files contained engineering formulas and part specifications including part dimensions, materials, performance capacities and tooling specifications for manufacturing machines. Jackson and other witnesses testified that the contents of those files were engineering formulas and specifications generally known in the bearing industry and widely available from customers, engineering textbooks and NHBB's internet catalog.

Analysis of the Lexar flash drive image showed that a large amount of data was added to the drive, possibly overwriting any previous contents. It also showed that in February 2006, the drive had been connected to the laptop of Ryan Faust, a Sargent employee. Both Jackson and Faust testified that the drive was used to provide Jackson with Sargent's sales data for recent years, and that nothing was transferred from the drive to the computer. Analysis of a later forensic image of Faust's computer did not reveal evidence of any NHBB files, although it did show that a large amount of data had been added to the computer, which had been reassigned to a different employee for a period of time, potentially overwriting the remnants of deleted files.

The forensic image of the Jackson laptop revealed the presence of the two NHBB files transferred to the Lexar flash drive on January 29, as well as an additional spreadsheet that was on the NHBB computer but not the Lexar flash drive. Jackson testified that after receiving a phone call about the suit on May 5, 2006, he had difficulty sleeping and searched his computer at 4:00 a.m. for any NHBB files he may have accidentally copied, found three, and placed them in the recycling bin — where they remained — with instructions not to erase them. Sometime in June 2007, some of the files' last access dates were changed, overwriting the prior last access date, which NHBB argued could have been after Jackson left NHBB. Analysis of the Jackson laptop did not reveal any of the other NHBB files at issue.

The image of the Jackson laptop also showed that numerous files had been deleted, large amounts of additional data had been added, and the disk

defragmenter and disk cleanup functions were run before it was turned over to NHBB for imaging. Adding large amounts of data overwrites previously deleted data and makes it far more difficult for analysts to discover what was present beforehand. The functions that were run delete temporary files and rearrange the placement of fragmented files on the hard drive, which also make it more difficult to determine the content of deleted files. Jackson's wife testified that she did not know how so many files were deleted, and that she regularly ran the disk functions to keep her computer running faster. The forensic image of the Jackson laptop showed that it was only the second time she had run those functions since buying the computer two years earlier.

NHBB ran searches on thirty-five Sargent computers for data contained in the NHBB files as well as the presence of anti-forensic software activity that could have altered or erased data. NHBB was also permitted to copy the file registry for each computer, which analysts can use to determine what hardware and software have been installed or used on a computer. As a result of the searches, NHBB imaged seven or eight hard drives that produced hits against the search terms; the remaining computers revealed no indication of NHBB files or wiping software. Although no NHBB files were ever found, three of the hard drives produced for imaging had been reformatted or replaced, erasing all data. Additionally, the image of an information technology (IT) employee's hard drive showed that disk-wiping software had been installed and that a user had run internet searches on erasing hard drives. The jury heard that the three computers were reformatted or replaced because of hardware problems or computer upgrades, and that it was normal practice for an IT technician at an information sensitive company to have file deletion software on his computer. NHBB also had access to Sargent's backup tapes for its email server, but one tape was not produced. The jury heard that Sargent was unable to produce that tape because it was unreadable for unknown reasons, possibly overwriting or damage to the tape.

The president of Sargent and the head of Kahr Bearing both testified that they had run searches of Sargent's networks and were unable to find any NHBB files. In response, NHBB tried to introduce testimony that Sargent had restricted NHBB access to its computers during discovery and that NHBB was therefore denied access to all Sargent's servers and the 250 computers it had originally desired. Despite the fact that the trial court sustained the defendants' objection based upon its granting of their motion *in limine*, NHBB was later allowed to cross-examine Sargent's expert witness concerning NHBB's limited access to Sargent computers after the witness opened the door to that subject. NHBB also attempted to introduce a copy of the trial court's evidence preservation orders as jury exhibits.

Although the trial court sustained the defendants' objection, it did instruct the jury that it had issued an order at the beginning of the case requiring all parties to preserve any evidence relevant to the case.

At the close of trial, NHBB requested the following jury instruction:

> At the beginning of this case, I issued an Order requiring the defendants to preserve relevant evidence. The evidence presented demonstrates that defendants Sargent and Jackson failed to comply with my Order. Therefore, if you find that a reasonable person in the position of Sargent and/or Jackson would have preserved the evidence, you may assume that the evidence that was not preserved would have helped the plaintiff, and you may decide the case as if the evidence was helpful to the plaintiff and presented by the plaintiff during the trial.

The trial court denied NHBB's request and gave the following instruction:

> I instruct you that all parties are under an obligation to preserve documents and records from the time that the party is reasonably on notice that a document or record may become evidence or be subject to discovery in a lawsuit. In this case, the Plaintiff maintains that the Defendants intentionally lost or destroyed certain records or documents subject to a preservation obligation. The Defendants deny this and to the extent that documents or records are missing, they suggest innocent explanations. Also, the Defendants, in turn, maintain that the Plaintiff destroyed certain records subject to a preservation obligation, a claim that the Plaintiff has denied. If, based on the evidence, you find that records or documents would have been relevant to this case and that a party intentionally lost or destroyed them to keep the information secret, you may draw an unfavorable inference on account of there having been missing documents or records. If you find, however, that there was an innocent explanation for the missing records or documents, or if you find that those records and documents would not have been relevant to this case, you may not draw such an inference.

The jury returned a verdict in favor of the defendants on the misappropriation of trade secrets claim, but found in NHBB's favor on its claim that Jackson breached his nondisclosure contract. NHBB moved for a judgment notwithstanding the verdict on the misappropriation claims, which was denied, and moved to set aside the verdict for a new trial on those claims, which was also denied. NHBB also moved for sanctions against the defendants for intentional spoliation of evidence. The trial court denied

NHBB's request for sanctions, stating that it had no authority to issue sanctions for what it considered to be indirect criminal contempt under our decision in *Mortgage Specialists v. Davey*, 153 N.H. 764 (2006). Rather, the trial court referred the matter to the New Hampshire Attorney General, who, after review, declined to prosecute. NHBB then appealed to this court.

NHBB makes a number of arguments on appeal. First, NHBB argues that the trial court erred in restricting NHBB's access to Sargent's computers and networks during discovery. Second, NHBB argues that the trial court made erroneous rulings on the admissibility of evidence by granting the defendants' motion *in limine* barring NHBB from "explain-[ing] to the jury in context how the denial of access and discovery abuse hampered its ability to directly establish misappropriation," and later excluding copies of the trial court's evidence preservation orders as exhibits. Third, NHBB argues that the trial court erred by not instructing the jury that the defendants had in fact violated the preservation orders, but giving a neutral instruction instead. Finally, NHBB argues that the trial court erred in denying its post-trial requests for a new trial and discovery sanctions against the defendants. We address each in turn.

*III. Discovery*

NHBB argues that the trial court should have granted it broader access to Sargent's computers and servers during discovery because misappropriation of electronic trade secrets is difficult to establish and thus requires extensive examination of electronic data systems. Only broad access, NHBB argues, could assure the preservation and detection of evidence that is easily erased or manipulated — either intentionally or unintentionally. The defendants respond that the trial judge acted properly by blocking what would have been an "open-ended fishing expedition," thus limiting access to relevant systems.

Decisions concerning pretrial discovery are within the sound discretion of the trial judge. *In the Matter of Maynard & Maynard*, 155 N.H. 630, 636 (2007). We review a trial court's rulings on the management of discovery under an unsustainable exercise of discretion standard. *Guyotte v. O'Neill*, 157 N.H. 616, 623 (2008). To establish that the trial court erred, NHBB must demonstrate that the trial court's ruling was clearly untenable or unreasonable to the prejudice of its case. *Blagbrough Family Realty Trust v. A & T Forest Prods.*, 155 N.H. 29, 40 (2007).

Although discovery rules are to be given a broad and liberal interpretation, the trial court has discretion to determine the limits of discovery. *Scarborough v. R.T.P. Enterprises, Inc.*, 120 N.H. 707, 711 (1980). A party's request for information must appear relevant and "reasonably

calculated to lead to the discovery of admissible evidence." SUPER. CT. R. 35(b)(1); *Scarborough*, 120 N.H. at 711. The trial court, therefore, is permitted to keep discovery within reasonable limits and avoid "open-ended fishing expeditions" or harassment to ensure that discovery contributes to the orderly dispatch of judicial business. *Robbins v. Kalwall Corp.*, 120 N.H. 451, 453 (1980); *Hartford Accident &c. Co. v. Cutter*, 108 N.H. 112, 114 (1967); *Riddle Spring Realty Co. v. State*, 107 N.H. 271, 278 (1966).

■ NHBB argues that the nature of electronic trade secrets requires particularly broad discovery. Because electronic discovery has been more predominant in federal courts, we look to those courts for guidance. We begin by recognizing that electronic data, including forensic imaging of hard drives, is within the scope of discoverable material. *See In re Pharmatrak, Inc.*, 329 F.3d 9, 17 (1st Cir. 2003); *Antioch Co. v. Scrapbook Borders, Inc.*, 210 F.R.D. 645, 652 (D. Minn. 2002). Because electronic discovery can easily become broad and intrusive, "[c]ourts have been cautious in requiring the mirror imaging of computers where the request is extremely broad in nature and the connection between the computers and the claims in the lawsuit are unduly vague or unsubstantiated in nature." *Balboa Threadworks, Inc. v. Stucky*, No. 05-1157-JTM-DWB, 2006 WL 763668, at *3 (D. Kan. Mar. 24, 2006). Without a sufficient showing of relevance and need, courts disallow the "drastic discovery measure" of permitting a party to image all of an opponent's electronic media. *McCurdy Group v. American Biomedical Group, Inc.*, 9 Fed. Appx. 822, 831 (10th Cir. 2001). Courts are more receptive, however, to circumscribed requests limited to specified individuals or computers expected to produce relevant information. *See Rowe Entertainment v. William Morris Agency*, 205 F.R.D. 421, 427-28, 432-33 (S.D.N.Y. 2002) (granting revised and limited request for defendants' backup tapes and emails and prescribing protocols for imaging); *Simon Property Group L.P. v. mySimon, Inc.*, 194 F.R.D. 639, 641 (S.D. Ind. 2000) (granting access to computers used by four named individuals); *Playboy Enterprises, Inc. v. Welles*, 60 F. Supp. 2d 1050, 1053 (S.D. Cal. 1999) (granting access to defendant's personal computer). We find the limitations imposed in federal courts to be both sensible and persuasive.

■ Here, the trial court denied NHBB's initial request to image all 250 computers and every server used at Sargent's Tucson facility. In doing so, it relied upon Sargent's claim that the request was overbroad and burdensome, and found that examining every hard drive and server would be "unnecessarily disruptive to [Sargent's] operations." Given that NHBB's claim encompassed trade secrets related only to bearings, that Sargent's Kahr Bearing division comprised only a small portion of its operations in

Tucson, and that Jackson only connected his flash drive to Faust's laptop, it was within the trial court's discretion to refuse NHBB access to Sargent's entire electronic network. Indeed, once NHBB limited its request to the backup tapes and those computers relevant to its allegations, the trial court granted its motion to compel. NHBB has not persuaded us that this ruling was clearly untenable or unreasonable to the prejudice of its case, and therefore the trial court did not unsustainably exercise its discretion.

*IV. Evidentiary Rulings*

NHBB argues that it should have been allowed to introduce the context in which it was required to review Sargent's electronic data so that the jury could understand why NHBB had limited evidence of misappropriation. Specifically, NHBB argues that the trial court erred by granting the defendants' motion *in limine* to exclude discovery disputes and then compounded that error by allowing Sargent's witnesses to testify that they had searched their electronic network and found no NHBB data.

The admissibility of evidence is generally within the discretion of the trial court, and we will uphold its rulings unless the exercise of its discretion is unsustainable. *Murray v. Developmental Servs. of Sullivan County*, 149 N.H. 264, 267 (2003). To meet this threshold, NHBB must demonstrate that the trial court's ruling was clearly untenable or unreasonable to the prejudice of its case. *Id.*

To be admissible, evidence must be relevant. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.H. R. Ev. 401.

Although it is true that Sargent fought NHBB's discovery requests, the trial court ultimately decided that NHBB's initial request was over-broad. Introducing evidence that Sargent resisted discovery requests that the trial court ultimately denied, therefore, has no tendency to make the existence of misappropriation more probable than it would be without the evidence. *See Empire Gas Corp. v. American Bakeries Co.*, 840 F.2d 1333, 1341 (7th Cir. 1988) (trial court properly excluded evidence of discovery disputes because it was "at best cumulative and probably irrelevant"); *Waters v. Genesis Health Ventures, Inc.*, 400 F. Supp. 2d 814, 818 (E.D. Pa. 2005) (stating evidence of contentious and hostile discovery disputes is "entirely irrelevant to the Plaintiff's . . . claim"). Indeed, as discussed above, discovery is generally within the province and discretion of the trial judge, not the jury. *See Maynard*, 155 N.H. at 636. Because the trial court was within its discretion to circumscribe discovery, its exclusion of discovery

disputes was not clearly untenable or unreasonable to the prejudice of NHBB's case. The trial court, therefore, did not unsustainably exercise its discretion.

NHBB goes on to argue that in light of the exclusion of discovery disputes, it was prejudiced when Sargent's president testified that he and another employee searched the entire network for NHBB data and found none. Any prejudice NHBB may have suffered, however, was certainly cured during its cross-examination of Sargent's expert witness. Despite the exclusion of discovery disputes, the trial court allowed NHBB to question Sargent's expert witness about NHBB's limited access to Sargent's data after the witness expanded the scope of examination by giving non-responsive answers.

■ In its cross-examination, NHBB was thus able to elicit that it was not permitted to examine computers unless they returned a hit on pre-agreed search terms, that it had originally wanted to image more than thirty-five computers, and that it was denied access to Sargent's servers. Based upon the witness's answers, it would have been clear to the jury that NHBB had less access to Sargent's electronic data than it desired. For NHBB to argue on appeal that it was prejudiced because it was not allowed to inform the jury of the limited scope of discovery is therefore without merit.

NHBB next argues that the trial court erred by not admitting copies of its preservation orders as exhibits, even after the jury requested them during deliberations. The defendants respond that the orders were rightfully excluded because it is the role of the judge to instruct the jury as to the law rather than allow the jury to distill the law from a court order.

■ ■ Interpretation of the orders required an interpretation of the parties' legal obligations. The scope of a party's legal obligations is a question of law, and therefore within the province of the trial court judge. *See State v. Barnett*, 147 N.H. 334, 339 (2001). Furthermore, legalese, at times, can obfuscate the underlying substance and meaning of words. Trial judges, therefore, are charged with the duty to "state and explain to the jury 'in clear and intelligible language the rules of law applicable to the issues of fact upon which their verdict is to be based.'" *Rawson v. Bradshaw*, 125 N.H. 94, 99 (1984) (quoting *Poulin v. Provost*, 114 N.H. 263, 264 (1974)). Here, it was the trial court's role to interpret its orders and the parties' obligations therein, and then relay those obligations to the jury in clear and intelligible language. It did just that.

Furthermore, admitting copies of the orders would have been cumulative. Although the trial court questioned the relevance of providing the jury with the actual orders, it did allow witnesses to reference the orders and

the fact that they required parties to preserve evidence in general. After witnesses mentioned the orders, the trial court gave the jury the following instruction:

> Members of the jury, you just heard reference to a Temporary Restraining Order, and you may hear further references during the course of this trial, and I just want to let you know that at the beginning of the case as well as the beginning of many cases such as this, there often is a request by one or both of the parties for an Order of the Court basically preserving the status quo.

After the close of evidence, the trial court further instructed the jury "that all parties are under an obligation to preserve documents and records from the time that the party is reasonably on notice that a document or record may become evidence or be subject to discovery in a lawsuit."

Review of the preservation orders reveals that the above instructions are an adequate summary of the parties' duties in this case. Because the trial court's refusal to allow copies of the orders into evidence was not clearly untenable or unreasonable to the prejudice of NHBB's case, the trial court did not unsustainably exercise its discretion.

Finally, NHBB argues that the trial court erred in not providing copies of the orders to the jury after they requested them during deliberation. Because there is no record of that decision or NHBB's contemporaneous objection thereto, it has not been preserved and we decline to review it. *See E. Derry Fire Precinct v. Nadeau*, 155 N.H. 429, 430 (2007) (declining review without sufficient record); *Berliner v. Clukay*, 150 N.H. 80, 82-84 (2003) (off-record conferences inadequate to preserve an objection).

## V. Adverse Inference Instruction

NHBB argues that the trial court erred by rejecting its requested instruction, which would have stated that the defendants had in fact violated the preservation orders. NHBB argues that the instruction was warranted as a sanction for discovery abuse, but that the trial court misinterpreted *Mortgage Specialists*, 153 N.H. 764, as constraining its authority to issue an adverse inference instruction as a sanction for spoliation of evidence. NHBB further argues that the trial court erred by referring only to the destruction of "documents or records," and by giving a party-neutral instruction stating that both parties had alleged spoliation of evidence.

The purpose of jury instructions is to identify issues of material fact, and to explain to the jury, in clear and intelligible language, the appropriate

standards of law by which it is to resolve them. *Nilsson v. Bierman*, 150 N.H. 393, 400 (2003); *Rawson*, 125 N.H. at 99. A trial court's decision to give an instruction must be based upon "some evidence to support a rational finding in favor of that [instruction]." *State v. Larose*, 157 N.H. 28, 33 (2008) (quotation omitted). The scope and wording of jury instructions, however, are within the sound discretion of the trial judge and are evaluated as a reasonable juror would have interpreted them. *State v. MacRae*, 141 N.H. 106, 114 (1996). A jury charge is sufficient as a matter of law if it fairly presents the case to the jury such that no injustice is done to the legal rights of the parties. *Carignan v. N.H. Int'l Speedway*, 151 N.H. 409, 418 (2004). In a civil case, we review jury instructions in context. *Id.* We will reverse if the charge, taken in its entirety, fails to explain adequately the law applicable to the case in such a way that the jury could have been misled. *Id.*

■■■ In general, "the trial judge's discretion to remove questions of fact from the jury is very limited." *St. Pierre v. Elgert*, 145 N.H. 620, 621 (2000). As one court held, however, the trial court may grant a party's request for an adverse inference instruction if the evidence establishes: "(1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a culpable state of mind; and (3) that the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." *Residential Funding Corp. v. DeGeorge Financial*, 306 F.3d 99, 107 (2d Cir. 2002) (quotations omitted). This standard accords with our own case law. *See Murray*, 149 N.H. at 271; *see also* SUPER. CT. R. 35 (g)(2)(b) (court can designate certain facts be taken as established to sanction discovery abuse). If, however, there remains a question of fact as to any of the three factors, spoliation is a matter for the jury, not the judge. *See Murray*, 149 N.H. at 271 (affirming jury instruction substantially the same as the instruction given here); *Rodriguez v. Webb*, 141 N.H. 177, 179 (1996).

■■■ Here, NHBB's requested instruction would have instructed the jury that the defendants had in fact failed to comply with the trial court's preservation orders, and, if the jury found a reasonable person would have preserved the evidence, that it could assume the destroyed evidence would have helped NHBB's case. The trial court refused the instruction because it found that conflicting evidence concerning spoliation required the question to go to the jury. In fact, the trial court's decision had nothing to do with its authority under *Mortgage Specialists*, to which it made only a passing reference in response to NHBB's mention of post-trial sanction procedures. Rather, the trial court recognized that disputed facts are

within the province of the jury. At the charge conference, the trial court stated that, were it up to the court, it would credit the plaintiff's witnesses. However, it went on to say: "[T]he jury is also free to credit [defendants'] witnesses with respect to innocent explanations for the disappearance of certain files, certain documents, and so forth. Whether the jury should do that or shouldn't, not my call . . . it's up to the jury to make that determination." Because there were conflicting explanations concerning the defendants' state of mind and the relevance of missing evidence, the trial court properly allowed the jury to determine the weight and credibility to be given the testimony. *See Transmedia Restaurant Co. v. Devereaux*, 149 N.H. 454, 461 (2003) (stating weight and credibility of testimony is within the jury's province).

We now turn to NHBB's argument that the wording of the instruction was erroneous because it referred to the destruction of "documents and records" as opposed to the destruction of "evidence." In the context of a thirty-day trial, during which the jury heard voluminous testimony concerning the destruction of evidence, a reasonable juror would have understood "documents or records" to encompass the electronic data at the heart of this case. The wording of the instruction did not give the jurors an erroneous conception of the law, and therefore reversal is not required. *See Carignan*, 151 N.H. at 418.

Finally, NHBB's argument that it was error to give a party-neutral instruction including reference to the defendants' spoliation claim also fails. NHBB argues that, by equating the two allegations of spoliation, the trial court left "the jury with an unfair impression of the evidence given the circumstances of this case." Although the trial court stated that, were it the fact finder, it would not credit the defendants' allegation, it also recognized that the jury was free to credit the witnesses as it saw fit. The trial court stated:

> [I]f I go out on a limb and fully, fully credit the Defendant's case and fully, fully discredit [NHBB's] witnesses, there is a case that could be made that [NHBB], as a policy from the start, was attempting to choke competition and, in fact, an inference could be made that this hard drive was being used for that purpose from the start. Do I accept that if I were the fact finder? . . . No, I don't accept that. But that's not my call.

Because there was some evidence concerning NHBB's improper imaging of the NHBB laptop hard drive, the trial court did not unsustainably exercise its discretion in giving the party-neutral instruction. *See Larose*, 157 N.H. at 33.

*VI. Post-Trial Motions*

NHBB argues that the trial court erred by denying its motion to set aside the verdict and order a new trial "even though it refused to provide to the jury a copy of its Orders . . . after the jury requested this information." As discussed above, NHBB has not preserved this issue and we decline to address it. NHBB also argues that the court erred by denying its motion for a new trial after the court "recognized that substantial evidence existed to support the conclusion that the Orders had been violated by Defendants."

A jury's verdict may only be set aside if it is conclusively against the weight of the evidence or if it is the result of mistake, partiality, or corruption. *PMC Corp. v. Houston Wire & Cable Co.*, 147 N.H. 685, 692 (2002). "Conclusively against the weight of the evidence" means that the verdict was one no reasonable jury could return. *Id.* We will not overturn the trial court's denial of NHBB's motion to set aside the verdict and order a new trial unless it was an unsustainable exercise of discretion. *Anderson v. Smith*, 150 N.H. 788, 790 (2004).

Although the trial court gave more credit to NHBB's allegations of spoliation, it acknowledged that the jury was free to find differently and submitted the case to the jury. That decision was not erroneous. After the jury apparently credited the defendants, it was not an unsustainable exercise of discretion for the trial court to uphold the verdict in light of conflicting testimony.

Finally, NHBB argues that the trial court erred by denying its motion for sanctions and referring the spoliation issue to the New Hampshire Attorney General for criminal investigation. NHBB argues that the trial court misinterpreted our holding in *Mortgage Specialists* as constraining its inherent power to sanction discovery abuses. NHBB did not, however, present the issue in its notice of appeal. *See Guyotte*, 157 N.H. at 623 (we will not review any issue that was not raised in the notice of appeal). After thorough review of the record, we also conclude that the trial court's decision was not plain error. *See* SUP. CT. R. 16-A. Accordingly, we will not address it.

We write briefly, however, to clarify any misunderstanding of our holding in *Mortgage Specialists*, 153 N.H. 764. The defendants in *Mortgage Specialists* destroyed evidence prior to trial, failed to produce certain documents and violated the trial court's injunction forbidding them from originating mortgages using allegedly misappropriated trade secrets. *Id.* at 782. In response to the plaintiff's motion for sanctions, the trial court required the defendants to pay fines "to vindicate the integrity of the

court," as well as reasonable attorney's fees and costs. *Id.* at 785. We held that the imposition of punitive fines to protect the court's integrity amounted to sanctions for criminal contempt as opposed to civil contempt. *Id.* at 791. Because the conduct the court was punishing occurred outside its presence, it had no authority to summarily impose punitive fines for the defendants' indirect criminal contempt. *Id.* Rather, if the trial court wished to vindicate its integrity, it was required to refer the matter for prosecution by a disinterested party. *Id.* at 789. It was the nature of the sanction — punitive fines — not the character of the defendants' conduct, that required disinterested prosecution. In no way did our holding affect a trial court's inherent authority to sanction discovery abuses by awarding reasonable attorney's fees and costs, or by imposing any other appropriate sanction. *See* SUPER. CT. R. 35 (g)(2).

*Affirmed.*

BRODERICK, C.J., and DALIANIS and HICKS, JJ., concurred.