NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-13395

COMMONWEALTH  vs.  JOSEPH JAMES.


Norfolk.     September 13, 2023. - April 23, 2024.

Present:  Budd, C.J., Gaziano, Kafker, Wendlandt, & Georges, JJ.


Forfeiture Proceeding.  Search and Seizure, Computer, Return.
    Constitutional Law, Taking of property, Burden of proof.
    Due Process of Law, Taking of property, Burden of proof.
    Practice, Civil, Presumptions and burden of proof.  Waiver.
    Search and Seizure, Warrant.  Statute, Construction.
    Words, "Public interest."



    Indictments found and returned in the Superior Court
Department on June 6, 2017, and February 20, 2018.

    A motion for return of property was heard by Robert C.
Cosgrove, J., and a second motion for return of property, filed
on April 21, 2022, was considered by him.

    The Supreme Judicial Court granted an application for
direct appellate review.


    Patrick Levin, Committee for Public Counsel Services, for
the defendant.
    Michael McGee, Assistant District Attorney, for the
Commonwealth.

GEORGES, J.  This case raises a question of statutory interpretation:  whether a judge may issue a forfeiture decree for property seized pursuant to a search warrant under G. L. c. 276, § 3, based solely on the judge's determination forfeiture would be in the "public interest," or whether the judge must instead follow the procedural requirements set forth in G. L. c. 276, §§ 4 to 8, before any forfeiture decree may issue.  For the reasons that follow, we conclude the latter interpretation should apply.  Accordingly, we vacate the Superior Court orders insofar as they denied the return of certain property to the defendant, and we remand the case for further proceedings consistent with this opinion.

1.  Background.  a.  Facts.[1]  Over the course of several months in 2016, the defendant, a thirty-eight year old professional photographer, sexually exploited a fifteen year old girl.  The defendant initially contacted the victim through a private message on a social networking website after the victim "liked" one of his posts.  The defendant then began communicating with the victim through telephone calls, text messages, and cell phone and computer applications that support

---

[1] Our recitation of the facts relies in part on the Commonwealth's "Statement of the Case," which was filed in the Superior Court after the defendant was arraigned in two cases stemming from his sexual exploitation of a minor.  The defendant does not dispute the facts contained within that statement for purposes of his appeal.

"video chat."  Through these communications, the defendant solicited and received nude and partially nude images of the victim.  The defendant eventually met the victim in person and started sexually abusing her.

After learning of their daughter's exploitation, the victim's parents notified the Weymouth police department, which, alongside State police, began investigating the defendant.  The victim's parents provided investigators with the victim's two cell phones.  Upon examining the cell phones, the State police were able to confirm that sexual abuse occurred and that the defendant and the victim were in frequent communication.  The police also found dozens of photographs of the defendant and the victim together, including photographs of the two kissing.

Based on the evidence obtained from the victim's cell phones, the police obtained a warrant for the defendant's arrest.  While attempting to locate the defendant, a State police trooper learned of an address where the defendant had lived.  The trooper spoke with a tenant living at that address who reported the defendant had left behind some personal belongings, including a computer tower[2] and an external hard

---

[2] "A computer tower is basically the shell of a computer, without the internal hardware such as disk drives and circuit boards installed."  United States v. 10,510 Packaged Computer Towers, More or Less, 152 F. Supp. 2d 1189, 1191 (N.D. Cal. 2001).

drive.  The police then obtained and executed a search warrant for the defendant's property at this location.  They seized a computer battery with a power cord, a separate bag of additional power cords, a computer mouse and speakers, a cell phone, the external hard drive, and the computer tower, which contained five internal hard drives.

After the internal hard drives were extracted from the computer tower, their contents, along with the contents of the external hard drive, were reviewed by a forensic examiner.  The examiner determined that one of the internal hard drives, a Kingston HyperX internal drive (Kingston drive), was the "main drive" in the computer tower and proceeded to "image" the Kingston drive.[3]  The examiner only "previewed" the data stored on the other internal hard drives, with the exception of one internal hard drive that could not be examined due to damage.

On the Kingston drive, the examiner uncovered nude images of the victim in the form of "selfies," which appeared to have been taken by the victim and sent to the defendant.  The Kingston drive also contained images of the victim and the defendant together, as well as communications between them showing the defendant was aware the victim was only fifteen

---

[3] "A forensic image is an exact replica, bit for bit, of the original storage device that allows investigation of past use without altering the original evidence."  New Hampshire Ball Bearings, Inc. v. Jackson, 158 N.H. 421, 424 (2009).

years old.  Additionally, the Kingston drive contained "hundreds of images of girls, in various stages of undress," but also "typical 'photographer' pictures of families, kids, and/or couples."[4]

The examiner did not uncover images of the victim or communications between her and the defendant on any of the other hard drives.  However, the examiner found images of nude and partially nude unidentified women on some of these hard drives.  Specifically, in a folder titled "Photography" on the external hard drive, the examiner found "'boudoir' style" photographs that featured women clothed or "scantily dressed," and who "systematically undressed" over the course of the photography sessions.  As the women did so, the focus of the photographs changed from the women generally, to specific nude body parts, particularly their breasts and vaginas.

On one of the internal hard drives, in a folder titled "Photo concepts, models, artists," the examiner discovered "one hundred forty-two (142) image files -- mostly of naked women."  On another internal hard drive, the examiner found adult pornography.  On the last internal hard drive that the examiner was able to access (Toshiba drive), the examiner mostly found software applications, movie files, and music files.

---

[4] The report does not specify the ages of these "girls."

A State police trooper with experience and training related to child pornography investigations examined the images of the nude and partially nude unidentified female subjects on the hard drives.  Although the trooper believed some of the images "may constitute child pornography if the subjects [were] under [eighteen] years old," the trooper was "not able to make a determination of the age of the females in the images."  The trooper also noted "[i]t would be nearly impossible to make a determination on the age of the females in the images without identification."

The trooper further suggested, based on his training and experience, the computer tower "should be looked at as one interconnected system," comprised of all five internal hard drives.  While the trooper asserted there could be "backups of the drives" -- otherwise referred to as "volume shadow copies" -- within any of the five internal hard drives, he stated "it is unknown" whether any such backups actually existed.[5]  The trooper further stated the Kingston drive

_____

[5] The trooper defined "volume shadow copies" as a "technology that allows for manual or automatic backups or snapshot[s] o[f] computer volumes or files."

contained ".lnk files," which "could show . . . interconnectivity between the drives in the tower."[6]

b. <u>Procedural history</u>. The defendant was indicted by a Norfolk County grand jury on eight counts of aggravated rape of a child, G. L. c. 265, § 23A, and three counts of enticement of a minor, G. L. c. 265, § 26C (<u>b</u>). He was then separately indicted on one count of possession of child pornography, G. L. c. 272, § 29C, based on the nude images of the victim discovered on the Kingston drive. No charges were brought relating to the images of the nude and partially nude unidentified female subjects found on the hard drives. The defendant eventually pleaded guilty to all charges, except for the eight counts of aggravated rape of a child, where he instead pleaded guilty to the lesser included offense of statutory rape under G. L. c. 265, § 23.

A Superior Court judge sentenced the defendant to a term of from seven years to seven years and one day in State prison for seven of the counts of statutory rape, and a term of from five years to five years and one day for the one count of possession of child pornography, all to be served concurrently. For one of the counts of statutory rape and for the three counts of

---

[6] As explained by the trooper, .lnk files "are shortcut files that link an application or file commonly found on a user's desktop, or throughout a system."

enticement of a minor, the judge sentenced the defendant to three years of probation, from and after his prison sentence.

After being sentenced, the defendant filed a motion for return of the property the Commonwealth seized from his former residence, including the computer tower, the external hard drive, four of the five internal hard drives (excluding the Kingston drive), the video camera, the computer battery, the power cords, the computer mouse, the speakers, and the cell phone. The defendant also filed a motion to "stay data erasure or destruction of the [Kingston drive]." In the latter motion, the defendant asserted "[m]ost, if not all of [his] important personal, business, or sentimental files are saved in the desktop, documents and downloads folders" contained within the Kingston drive. He requested the Commonwealth preserve the Kingston drive and send him "a list of those files in order to determine whether or not a subsequent motion to preserve or copy that data is appropriate."

In response, the Commonwealth filed a "motion for leave to destroy and dispose of certain computer equipment, digital media and contraband seized from [the] defendant via search warrant." Aside from the Toshiba drive -- which only contained applications, movies, and music -- the Commonwealth sought to destroy the hard drives and cell phone pursuant to G. L. c. 276, § 3, asserting a "public interest" in destroying the devices.

However, the Commonwealth agreed to return the computer tower (with the hard drives removed), along with the Toshiba drive, the video camera, the computer battery, the power cords, the computer mouse, and the speakers.

After holding a nonevidentiary hearing, the motion judge granted the defendant's motion for return of property with respect to the uncontested property, but denied his request for the remaining property, including three of the five internal hard drives, as well as the external hard drive. The motion judge also granted the defendant's motion to stay destruction of the Kingston drive and ordered the Commonwealth to provide a list of files on the drive, but only to the extent that such a list already existed.[7] The judge took no action on the Commonwealth's motion to destroy the hard drives and cell phone.[8]

The defendant timely appealed from the motion judge's rulings in November 2018.[9] The Appeals Court subsequently granted a stay of his appeal to allow the defendant to file a renewed motion for return of property in the Superior Court, which the defendant filed in March 2022. In his renewed motion,

_____

[7] The motions were considered by a different Superior Court judge from the sentencing judge.

[8] Although it is unclear from the record, the cell phone may have been returned to the defendant.

[9] The defendant's appeal only relates to the seized property and not to his pleas, convictions, or sentences.

the defendant principally raised, for the first time, the issue of lack of process under G. L. c. 276, §§ 4 to 8.  The same motion judge denied the renewed motion in September 2022.  The defendant appealed from the denial, which was consolidated with his prior appeal, and we granted his application for direct appellate review.

2.  Discussion.  In reviewing the denial of a motion for return of property pursuant to G. L. c. 276, § 3, "[w]e begin by acknowledging the strong constitutional protections against governmental deprivations of private property."  Commonwealth v. Salmons, 96 Mass. App. Ct. 61, 65 (2019).  Among these constitutional protections, "no part of the property of any individual can, with justice, be taken from him, or applied to public uses, without his own consent, or that of the representative body of the people."  Art. 10 of the Massachusetts Declaration of Rights.  Additionally, "no subject shall be . . . deprived of his property . . . or estate, but by the judgment of his peers, or the law of the land."  Art. 12 of the Massachusetts Declaration of Rights.

a.  The search warrant statute.  Before proceeding with our analysis, we summarize the various sections of the statutory scheme at issue.  General Laws c. 276, §§ 1 et seq. (search warrant statute), concerns the seizure, retention, and disposal of property obtained pursuant to a search warrant.  See G. L.

c. 276, §§ 1 (describing types of property that may be subject of search warrant), 2-2C (describing requirements for issuing valid search warrant). Most notably, § 3 provides that, apart from certain exceptions not relevant here, "all other property seized in execution of a search warrant shall be disposed of as the court or justice orders and may be forfeited and either sold or destroyed, as the public interest requires, in the discretion of the court or justice." G. L. c. 276, § 3.

Immediately following § 3, the statutory scheme sets forth detailed procedures for issuing a decree of forfeiture regarding property seized in execution of a search warrant. See G. L. c. 276, §§ 4-8. Pursuant to § 4, the owner of the property, and others with an interest in the property, are entitled to notice "[b]efore a decree of forfeiture . . . is issued." G. L. c. 276, § 4. Such notice must "set[] forth the substance of the complaint" and provide a "time and place" for the owner to appear to "show cause why the articles seized should not be forfeited." Id. Section 5 describes service of process for the notice, which must be served "not less than fourteen days before the time appointed for trial." G. L. c. 276, § 5. Section 6 allows for the postponement of "the time appointed for the trial" if notice has not been properly served, if the property needs to be retained for use as evidence in a trial, or "if other sufficient cause appears." G. L. c. 276, § 6. Section 7

describes the procedure for forfeiture "[i]f upon trial the property is adjudged forfeited."  G. L. c. 276, § 7.  Finally, § 8 describes the process for appealing from a forfeiture decree, indicating, inter alia, that "[a]ll proceedings [on appeal] . . . shall conform so far as may be to proceedings in criminal cases."  G. L. c. 276, § 8.

We now proceed to address the primary question in this case:  whether there is any interplay between G. L. c. 276, § 3, on the one hand, and §§ 4 to 8, on the other.  As with all questions of statutory interpretation, we exercise de novo review.  See Matter of Expungement, 489 Mass. 67, 73 (2022).

The Commonwealth asks us to construe the phrase "as the public interest requires" in § 3 as a stand-alone provision unrelated to the ensuing procedural requirements of §§ 4 to 8. The defendant counters that the Commonwealth and the courts must strictly adhere to the procedural requirements of §§ 4 to 8 before seized property can be lawfully forfeited pursuant to § 3.  We conclude the Legislature intended for the procedural safeguards laid out in §§ 4 to 8 to apply whenever a decree of forfeiture is issued under § 3.[10]

---

[10] Our opinion today is limited to the forfeiture of property under the search warrant statute not covered by another forfeiture statute.  See, e.g., G. L. c. 94C, § 47 (forfeiture of controlled substances); G. L. c. 265, § 56 (forfeiture of property used in human trafficking); G. L. c. 266, § 143H

"We interpret a statute according to the intent of the Legislature, which we ascertain from all the statute's words, construed by the ordinary and approved usage of the language . . ." (quotation and citation omitted). Ciani v. MacGrath, 481 Mass. 174, 178 (2019). "Ordinarily, where the language of a statute is plain and unambiguous, it is conclusive as to legislative intent" (citation omitted). Id. "Ultimately, we must avoid any construction of statutory language . . . that . . . would frustrate the Legislature's intent" (citation omitted), Conservation Comm'n of Norton v. Pesa, 488 Mass. 325, 332 (2021), or "render . . . any portion of it meaningless," Williams v. Board of Appeals of Norwell, 490 Mass. 684, 690 (2022).

Interpreting § 3 in isolation would violate the well-established rule of statutory construction that "[w]e do not interpret . . . statutory language . . . so as to render it or any portion of it meaningless." Williams, 490 Mass. at 690. If we were to adopt the interpretation of § 3 advocated by the Commonwealth and view § 3 in isolation, a court could forgo the procedures set forth in §§ 4 to 8 to issue a decree of

(forfeiture of illegal sound recordings); G. L. c. 267A, § 4 (forfeiture of laundered money and property). Our opinion also does not reach the enumerated exceptions under G. L. c. 276, § 3 (a)-(c), including the "dangerous weapons" exception under § 3 (b), which we recently construed in Commonwealth v. Fleury, 489 Mass. 421, 429-430 (2022).

forfeiture, so long as the court concluded that "the public interest requires" forfeiture. The procedures in §§ 4 to 8, therefore, would merely be superfluous suggestions. In contrast, reading G. L. c. 276, §§ 4 to 8, as prescribing the procedures a court must follow to determine if "the public interest requires" forfeiture under § 3 gives meaning and harmony to all sections of the search warrant statute and thus effectuates the Legislature's over-all intent. See Marengi v. 6 Forest Rd. LLC, 491 Mass. 19, 25 (2022) (we "harmonize . . . related provisions . . . of the same statutory scheme so as to give full effect to the expressed intent of the Legislature" [citation omitted]).

To the extent there is any lingering ambiguity in the statutory language, we turn to the legislative history. See Ciani, 481 Mass. at 178. In 1870, the Legislature passed an earlier version of G. L. c. 276, §§ 4 to 8, one year after this court held the forfeiture provision of the search warrant statute then in place was procedurally deficient. See St. 1870, c. 242, §§ 1-4; Attorney Gen. v. Justices of the Mun. Court of Boston, 103 Mass. 456, 463-469 (1869). Before the decision in Attorney Gen., under the historic search warrant statute, courts could issue a warrant for several types of contraband, including

gambling apparatuses or implements.[11]  See R.S. (1836), c. 142, §§ 1-5.  When seized property was no longer needed as evidence, it was to be destroyed under the direction of the court.[12]  See R.S. (1836), c. 142, § 5.  The statute did not require the court to conduct any proceedings or issue any notice whatsoever before ordering the destruction of the seized property.  See id.

Subsequently, in 1869, the Legislature expanded the reach of the search warrant statute beyond contraband to allow "furniture, fixtures, and personal property" to be seized from "gaming-houses."[13]  See St. 1869, c. 364 (amending historic search warrant statute).  Because possession of this property was not inherently unlawful, such property was to be sold rather than destroyed if "upon [a] hearing" the court "adjudged" that the property was seized from a gaming-house at a time when gambling was taking place.  See St. 1869, c. 364, § 3.

---

[11] Specifically, pursuant to R.S. (1836), c. 142, §§ 1 and 2, courts could issue a search warrant for (1) stolen or embezzled property, (2) counterfeit money, (3) obscene materials, (4) lottery tickets, and (5) gambling apparatuses or implements.

[12] Stolen property was returned to the owner rather than destroyed.  See R.S. (1836), c. 142, § 5.

[13] As the name suggests, "gaming-houses" were buildings where gambling took place.  See Commonwealth v. Blankinship, 165 Mass. 40, 42-43 (1895).

The historic search warrant statute and the 1869 amendment were considered by this court in Attorney Gen., 103 Mass. at 457, after an agent of the Commonwealth seized gambling implements, furniture, and personal property from an alleged gaming-house but did not arrest any persons in connection with the alleged gambling. As a result, the lower court was faced with deciding whether to order the sale and destruction of property belonging to unknown persons who had received no notice of the proceedings. Id. at 457, 463.

On appeal, this court determined the lower court could not order the sale and destruction of the property because proper procedures had not been carried out. Id. at 469. We observed that "[t]he terms of the statute, taken literally" did not require "any formal[] . . . notice or trial," id. at 464, but we nonetheless read these requirements into the statute on the grounds that it would be "entirely contrary to the spirit of our laws that property which may be valuable should be literally destroyed without some attempt to notify the owner . . . or [without] hav[ing] a hearing on the question whether the property can be said to be of that class which the statute intends to condemn," id. at 465. Regarding the 1869 amendment, the court concluded "to fall within the familiar provisions of our Constitution . . . [t]he hearing and adjudication spoken of in the [amendment] must be understood to mean a judicial

hearing, with all its incidents, of notice, actual or constructive[,] trial, and the right of appeal to a jury."  <u>Id</u>. 468.

One year after this court's decision in <u>Attorney Gen</u>., the Legislature passed St. 1870, c. 242, which required notice and a trial <u>prior</u> to the issuance of a forfeiture decree and provided the right to appeal from a forfeiture decree.  Specifically, the statute required

> "written notice . . . setting forth the substance of the [forfeiture] complaint, [and] commanding the persons, if any, in whose possession the things were found, and the owner, if alleged, and all other persons claiming any interest therein, to appear before said court or magistrate at a time and place therein named, to show cause, if any they have, why the things seized should not be forfeited."

St. 1870, c. 242, § 2.  The statute also detailed how notice was to be served and permitted the trial to be postponed if such notice was not "duly served."  St. 1870, c. 242, §§ 3-4.

It is no coincidence that St. 1870, c. 242, was passed directly after this court's decision in <u>Attorney Gen</u>., and that it codified the procedures this court read into the search warrant statute.  The Legislature's intent in passing these provisions was clearly to ensure that proper procedure was followed for the issuance of a decree of forfeiture. Considering this history, we conclude the legislative intent behind G. L. c. 276, §§ 4 to 8, much like its precursor, is to provide the necessary procedural process to ensure that

forfeiture is not "contrary to the spirit of our laws" and "fall[s] within the familiar provisions of our Constitution." Attorney Gen., 103 Mass. at 465, 468. It would therefore be contrary to the Legislature's intent to read G. L. c. 276, § 3, as a stand-alone provision, separated from the procedural safeguards in §§ 4 to 8.

The Commonwealth cites Beldotti v. Commonwealth, 41 Mass. App. Ct. 185 (1996), cert. denied, 520 U.S. 1173 (1997), in support of its argument that the "public interest" clause of G. L. c. 276, § 3, is untethered to the procedural requirements of §§ 4 to 8. The defendant in Beldotti was convicted of murder in the first degree for a "brutal sex crime" and sentenced to a term of imprisonment of life without the possibility of parole. Id. at 185. The Appeals Court denied the defendant's motion for the return of property seized from his house pursuant to a search warrant, reasoning that "[a]lthough property may not be forfeited simply because it is offensive or repugnant," there was "a connection between the property . . . and the crime . . . committed" that warranted forfeiture. Id. at 189.

In deciding Beldotti, the Appeals Court gave no consideration as to whether the procedural requirements in §§ 4 to 8 had been followed, and it is unclear whether either party raised the issue on appeal. Accordingly, to the extent that Beldotti may be read as allowing forfeiture to be accomplished

outside of the parameters §§ 4 to 8, it is not correct and not to be followed. When the Commonwealth seizes property pursuant to a search warrant, unless another statute governs forfeiture or the property falls under one of the exceptions enumerated in § 3, the procedural requirements of the ensuing sections must be complied with before a forfeiture decree may be entered.

b. Standard of proof at forfeiture proceedings. Having determined the procedural requirements of §§ 4 to 8 must be followed prior to a determination whether forfeiture is in the "public interest" under § 3, we take this opportunity to clarify the standard of proof to be applied under the search warrant statute, as the statute does not specify the applicable standard. We hold that a preponderance of the evidence standard, as the general standard in civil cases, applies here and the burden of proof falls upon the Commonwealth. See Doe, Sex Offender Registry Bd. No. 380316 v. Sex Offender Registry Bd., 473 Mass. 297, 309 (2015) (Doe), and cases cited. See also Andrews, petitioner, 449 Mass. 587, 591 (2007) ("the baseline rule [is] that the fact finder in a civil case usually employs a fair preponderance of the evidence standard"). Therefore, in a forfeiture action brought under the search warrant statute, the Commonwealth has the burden of proving by a preponderance of the evidence that "the public interest requires" forfeiture. G. L. c. 276, § 3. In arriving at this conclusion, we have balanced

"the private interests affected, the risk of erroneous deprivation, the probable value of additional or substitute safeguards, and the governmental interests involved," and we are satisfied that this standard of proof accords with due process (citation omitted). Doe, supra at 311.

c. Waiver. It is undisputed that the procedures set forth in G. L. c. 276, §§ 4 to 8, were not followed here. As a threshold matter, the Commonwealth argues that the defendant's claim of entitlement to such procedure is untimely and waived because he raised the issue of procedural deficiencies for the first time in his renewed motion for return of property, rather than in his original motion. We disagree.

Rather than denying the defendant's renewed motion on waiver grounds, the Superior Court judge instead reached the merits of the defendant's claim. Although Rule 61 of the Rules of the Superior Court (2023), which governs motions for the return of property, prescribes a particular time period for the filing of such motions, it also confers discretion upon Superior Court judges to entertain these motions "at such other time as the court may allow." Therefore, it was within the judge's discretion to reach the merits of the defendant's renewed motion. See Commonwealth v. Haskell, 438 Mass. 790, 792-793 (2003) (discussing judge's discretion to hear renewed pretrial

motions pursuant to Mass. R. Crim. P. 13 [a] [5], 378 Mass. 871 [1979]).

d. Application of § 3. Irrespective of any procedural deficiencies, the Commonwealth argues forfeiture is in the "public interest" and appropriate in this case because of the odious nature of the crimes for which the defendant was convicted, and because of the possibility the disputed hard drives "may" contain child pornography. We believe such a determination is premature.

The Commonwealth posits that returning any of the drives would "result in a high likelihood" of returning child pornography to the defendant because the drives "may" have been interconnected with the Kingston drive. In support of these assertions, the Commonwealth relies entirely on the affidavit of a State police trooper averring there are "hundreds of images of unidentified nude or semi-nude females" of indeterminate ages on the disputed drives that "may" constitute child pornography "if" the subjects were under eighteen years of age. Additionally, the trooper asserted that the presence of .lnk files "could" signify that the drives were "interconnected" to the Kingston drive, which contains pictures of the victim. The trooper does not purport to know the likelihood of either possibility being true.

The Commonwealth's arguments here are analogous to those that it previously presented in Salmons, 96 Mass. App. Ct. at 65, where the Commonwealth objected to the return of the defendant's seized property based only on speculation. In Salmons, the defendant was "arrested . . . for assault and battery and related charges" stemming from an incident of domestic violence. Id. at 62. As part of the investigation, the police seized the defendant's three cell phones, two of which "contain[ed] 'numerous and sexually explicit photographs and videos of the defendant and [the victim].'" Id. at 63.

The Commonwealth in Salmons filed a motion to erase the data on the defendant's cell phones based solely on the possibility "the data on them could be used to harm the victim" in the future (emphasis added). Id. at 68. To avoid this purported risk, a judge granted the Commonwealth's motion without any "finding of fact that such harm was in any sense likely." Id. at 69. The Appeals Court reversed, reasoning that mere speculation that "lawful property . . . might be used to commit a crime or inflict other harm in the future" cannot overcome "the strong constitutional protections against governmental deprivations of private property." Id. at 65, 68.

Here, as in Salmons, the defendant's property may not be forfeited based merely on the speculative concern that harm could occur if the disputed property were to be returned. There

has been no showing (as of yet) to justify that concern. Significantly, the trooper's supporting affidavit, the only basis for the Commonwealth's concerns, does not establish that future harm is likely to occur or that the property in question constitutes illegal contraband.  Instead, the trooper only makes vague assertions about potential illegality, in that the images on the disputed drives "may" constitute child pornography "if" the subjects were under eighteen years old.  Such assertions on their own cannot justify forfeiture at this juncture.

To balance all the competing interests, what is required are appropriate proceedings in accordance with G. L. c. 276, §§ 4 to 8, including notice and a trial, so a judge may evaluate, on a full factual record, the merits of the competing arguments to determine if a forfeiture decree is in the "public interest" under § 3.  Indeed, this case hinges on numerous factual disputes and thus requires a fact finder to resolve them.  To be clear, we do not suggest it would be impossible or even unlikely for the Commonwealth to demonstrate the hard drives contain child pornography or forfeiture is not otherwise in the public interest; we conclude only that proceedings consistent with the requirements of §§ 4 to 8 are necessary for a judge to make such a determination.

3.  Conclusion.  The orders of the Superior Court denying in part the defendant's motion for return of property and

denying the defendant's renewed motion for return of property are vacated and set aside insofar as they denied the return of certain property.  The matter is remanded to the Superior Court for forfeiture proceedings consistent with this opinion.[14]  We express no view on the merits of the issues to be decided.

So ordered.

---

[14] We reject the defendant's argument that the only lawful remedy in this case would be an order requiring the return of his property.  None of the cases the defendant cites requires this remedy, and in fact, remand was ordered in the majority of these cases.  See, e.g., Lindell v. United States, 82 F.4th 614, 622 (8th Cir. 2023), cert. denied, U.S. Supreme Ct., No. 23-950 (Apr. 15, 2024) (remanding to determine whether continued retention of plaintiff's cell phone was justified when "the record ha[d] not been developed on this issue").  See also Nelson v. Colorado, 581 U.S. 128, 139 (2017) (remanding when State had "zero claim of right" to property at issue).